McDONALD ᴇᴛ ᴀʟ. *v.* UNITED STATES.

No. 36.   Argued October 13, 1948.—Decided December 13, 1948.

*Charles E. Ford* and *John Lewis Smith, Jr.* argued the cause and filed a brief for petitioners.

*Frederick Bernays Wiener* argued the cause for the United States.   With him on the brief were *Solicitor General Perlman, Robert S. Erdahl* and *Beatrice Rosenberg*.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioners were convicted in the District Court on evidence obtained by a search made without a warrant. The Court of Appeals affirmed on a divided vote. 83 U. S. App. D. C. 96, 166 F. 2d 957. We brought the case here on certiorari because of doubts whether that result squared with *Johnson* v. *United States,* 333 U. S. 10, and *Trupiano* v. *United States,* 334 U. S. 699.

Petitioners were tried without a jury in the District Court for the District of Columbia on an indictment in four counts, charging offenses of carrying on a lottery known as the numbers game in violation of 22 D. C. Code §§ 1501, 1502, 1504 (1940). They were found guilty on all counts.

Petitioner McDonald, who had previously been arrested for numbers operations, had been under police observation for several months prior to the arrest. During this period and while he was maintaining a home in the District of Columbia, he rented a room in the residence of a Mrs. Terry, who maintained a rooming house in the District. His comings and goings at this address were under surveillance by the police for about two months. They had observed him enter the rooming house during the hours in which operations at the headquarters of the numbers game are customarily carried on.

On the day of the arrest three police officers surrounded the house. This was midafternoon. They did not have a warrant for arrest nor a search warrant. While outside the house, one of the officers thought that he heard an adding machine. These machines are frequently used in the numbers operation. Believing that the numbers game was in process, the officers sought admission to the house.

One of them opened a window leading into the landlady's room and climbed through. He identified himself to her and admitted the other officers to the house.

After searching the rooms on the ground floor, they proceeded to the second floor. The door of an end bedroom was closed. But one of the officers stood on a chair and looked through the transom. He observed both petitioners in the room, as well as numbers slips, money piled on the table, and adding machines. He yelled to McDonald to open the door and McDonald did so. Both petitioners were arrested, and the officers seized the machines, a suitcase of papers, and money. Whether these machines and papers should have been suppressed as evidence and returned to petitioner McDonald is the major question presented.

The Fourth Amendment to the Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike. It marks the right of privacy as one of the unique values of our civilization and, with few exceptions, stays the hands of the police unless they have a search warrant issued by a magistrate on probable cause supported by oath or affirmation. And the law provides as a sanction against the flouting of this constitutional safeguard the suppression of evidence secured as a result of the violation, when it is tendered in a federal court. *Weeks* v. *United States,* 232 U. S. 383.

The prosecution seeks to build the lawfulness of the search on the lawfulness of the arrest and so justify the

search and seizure without a warrant. See *Agnello* v. *United States,* 269 U. S. 20, 30; *Harris* v. *United States,* 331 U. S. 145, 150–151. The reasoning runs as follows: Although it was an invasion of privacy for the officers to enter Mrs. Terry's room, that was a trespass which violated her rights under the Fourth Amendment, not McDonald's. Therefore so far as he was concerned, the officers were lawfully within the hallway, as much so as if Mrs. Terry had admitted them. Looking over the transom was not a search, for the eye cannot commit the trespass condemned by the Fourth Amendment. Since the officers observed McDonald in the act of committing an offense, they were under a duty then and there to arrest him. See 4 D. C. Code §§ 140, 143 (1940). The arrest being valid the search incident thereto was lawful.

We do not stop to examine that syllogism for flaws. Assuming its correctness, we reject the result.

This is not a case where the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name of the law. They had been following McDonald and keeping him under surveillance for two months at this rooming house. The prosecution now tells us that the police had no probable cause for obtaining a warrant until, shortly before the arrest, they heard the sound of the adding machine coming from the rooming house. And there is vague and general testimony in the record that on previous occasions the officers had sought search warrants but had been denied them. But those statements alone do not lay the proper foundation for dispensing with a search warrant.

Where, as here, officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant. A search without a warrant demands exceptional circumstances, as we held in *Johnson* v. *United States, supra.* We will not assume that where a defendant has been under surveillance

for months, no search warrant could have been ob-
tained. What showing these officers made when they
applied on the earlier occasions, the dates of these ap-
plications, and all the circumstances bearing upon the
necessity to make this search without a warrant are
absent from this record. We cannot allow the constitu-
tional barrier that protects the privacy of the individual
to be hurdled so easily. Moreover, when we move to
the scene of the crime, the reason for the absence of a
search warrant is even less obvious. When the officers
heard the adding machine and, at the latest, when they
saw what was transpiring in the room, they certainly
had adequate grounds for seeking a search warrant.

Here, as in *Johnson* v. *United States* and *Trupiano*
v. *United States,* the defendant was not fleeing or seeking
to escape. Officers were there to apprehend petitioners
in case they tried to leave. Nor was the property in
the process of destruction nor as likely to be destroyed
as the opium paraphernalia in the *Johnson* case. Peti-
tioners were busily engaged in their lottery venture.
No reason, except inconvenience of the officers and delay
in preparing papers and getting before a magistrate,
appears for the failure to seek a search warrant. But
those reasons are no justification for by-passing the con-
stitutional requirement, as we held in *Johnson* v. *United
States, supra,* p. 15.

We are not dealing with formalities. The presence of
a search warrant serves a high function. Absent some
grave emergency, the Fourth Amendment has interposed
a magistrate between the citizen and the police. This
was done not to shield criminals nor to make the home a
safe haven for illegal activities. It was done so that an
objective mind might weigh the need to invade that
privacy in order to enforce the law. The right of privacy
was deemed too precious to entrust to the discretion of
those whose job is the detection of crime and the arrest

of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

It follows from what we have said that McDonald's motion for suppression of the evidence and the return of the property to him should have been granted. *Weeks* v. *United States, supra; Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 358. It was, however, denied and the unlawfully seized evidence was used not only against McDonald but against Washington as well, the two being tried jointly. Apart from this evidence there seems to have been little or none against Washington. Even though we assume, without deciding, that Washington, who was a guest of McDonald, had no right of privacy that was broken when the officers searched McDonald's room without a warrant, we think that the denial of Mc-Donald's motion was error that was prejudicial to Washington as well. In this case, unlike *Agnello* v. *United States, supra,* p. 35, the unlawfully seized materials were the basis of evidence used against the codefendant. If the property had been returned to McDonald, it would not have been available for use at the trial. We can only speculate as to whether other evidence which might have been used against Washington would have been equally probative.

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE RUTLEDGE concurs in the result, and in the opinion insofar as it relates to the petitioner McDon-

ald.  With respect to the petitioner Washington he is of the view that the evidence, having been illegally obtained, was inadmissible.  Cf. *Malinski* v. *New York,* 324 U. S. 401, opinion dissenting in part p. 420 at pp. 430–432.

MR. JUSTICE JACKSON, concurring.

I agree with the result and with the opinion of the Court.  But it rejects the search which two courts below have sustained without saying wherein it was wrong.  It may be helpful to lower courts and to the police themselves to state what appears to some of us as the reason this search is bad.

The police for several weeks had this defendant, McDonald, under surveillance.  The United States Commissioner was approached about a search warrant but, for reasons which do not appear, declined to issue it.  The only additional information which led the officers to take the law into their own hands and make this search without a warrant was that they heard an adding machine or a typewriter—the witness was not sure which—operating on the premises.  Certainly the sound of an adding machine or typewriter, standing alone, is no indication of crime and it could become significant only when weighed in connection with other evidence.  A magistrate might either have issued or refused a warrant if request had been made.

However, the officer in charge of the investigation took the matter into his own hands.  He neither had nor sought a search warrant or warrant of arrest; he did not then have knowledge of a crime sufficient, even in his own opinion, to justify arrest, and he did not even know that the suspect, McDonald, was in the rooming house at the time.  Nevertheless, he forced open the window of the landlady's bedroom and climbed in.  He apparently was in plain clothes but showed his badge to the frightened woman, brushed her aside and then

458

unlocked doors and admitted two other officers. They then went to the hall outside the room rented and occupied by defendant. The officer in charge climbed on a chair and looked through a transom. Seeing the defendant McDonald engaged in activity which he considered to be part of the lottery procedure, he arrested him and searched the quarters. The Government argued, and the court below held, that since the forced entry into the building was through the landlady's window, in a room in which the defendant as a tenant had no rights, no objection to this mode of entry or to the search that followed was available to him.

Doubtless a tenant's quarters in a rooming or apartment house are legally as well as practically exposed to lawful approach by a good many persons without his consent or control. Had the police been admitted as guests of another tenant or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways. Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain. If in this manner they, or any private citizen, saw a crime in the course of commission, an arrest would be permissible.

But it seems to me that each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry. Here the police gained access to their peeking post by means that were not merely unauthorized but by means that were forbidden by law and denounced as criminal. In prying up the porch window and climbing

into the landlady's bedroom, they were guilty of breaking and entering—a felony in law and a crime far more serious than the one they were engaged in suppressing.   Having forced an entry without either a search warrant or an arrest warrant to justify it, the felonious character of their entry, it seems to me, followed every step of their journey inside the house and tainted its fruits with illegality.   *Cf. Weeks* v. *United States,* 232 U. S. 383; *Taylor* v. *United States,* 286 U. S. 1; *Johnson* v. *United States,* 333 U. S. 10.

Even if one were to conclude that urgent circumstances might justify a forced entry without a warrant, no such emergency was present in this case.   This method of law enforcement displays a shocking lack of all sense of proportion.   Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it.   In this case the police had been over two months watching the defendant McDonald. His criminal operation, while a shabby swindle that the police are quite right in suppressing, was not one which endangered life or limb or the peace and good order of the community even if it continued another day or two; neither was the racket one the defendant was likely to abandon.   Conduct of the numbers racket is not a solitary vice, practiced in secrecy and discoverable only by crashing into dwelling houses.   The real difficulty is that it is so little condemned by otherwise law-abiding people that it flourishes widely and involves multitudes of people. It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it.   While I should be human enough to

apply the letter of the law with some indulgence to officers acting to deal with threats or crimes of violence which endanger life or security, it is notable that few of the searches found by this Court to be unlawful dealt with that category of crime. Almost without exception, the overzeal was in suppressing acts not *malum in se* but only *malum prohibitum*.[1] While the enterprise of parting fools from their money by the "numbers" lottery is one that ought to be suppressed, I do not think its suppression is more important to society than the security of the people against unreasonable searches and seizures. When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

I am the less reluctant to reach this conclusion because the method of enforcing the law exemplified by this search is one which not only violates legal rights of defendant but is certain to involve the police in grave troubles if continued. That it did not do so on this occasion was due to luck more than to foresight. Many homeowners in this crime-beset city doubtless are armed. When a woman sees a strange man, in plain clothes, prying up her

---

[1] For example, the instant case involves a statute forbidding lotteries in the District of Columbia; *Trupiano* v. *United States,* 334 U. S. 699, liquor control and revenue statutes; *Johnson* v. *United States,* 333 U. S. 10, narcotic control and revenue statutes; *Nathanson* v. *United States,* 290 U. S. 41, liquor control and tariff statute. Other cases involving liquor control or taxing statutes, or both, are numerous; see, *e. g., Taylor* v. *United States,* 286 U. S. 1; *United States* v. *Lefkowitz,* 285 U. S. 452; *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344; *Gambino* v. *United States,* 275 U. S. 310; *Amos* v. *United States,* 255 U. S. 313. *Agnello* v. *United States,* 269 U. S. 20, involved cocaine control and taxing statutes; and *Weeks* v. *United States,* 232 U. S. 383, involved a statute forbidding use of the mails to distribute lottery tickets.

bedroom window and climbing in, her natural impulse would be to shoot. A plea of justifiable homicide might result awkwardly for enforcement officers. But an officer seeing a gun being drawn on him might shoot first. Under the circumstances of this case, I should not want the task of convincing a jury that it was not murder. I have no reluctance in condemning as unconstitutional a method of law enforcement so reckless and so fraught with danger and discredit to the law enforcement agencies themselves.

As to defendant Washington: He was a guest on the premises. He could have no immunity from spying and listening by those rightfully in the house. But even a guest may expect the shelter of the rooftree he is under against criminal intrusion. I should reverse as to both defendants.

MR. JUSTICE FRANKFURTER, having joined in the Court's opinion, also concurs in this opinion.

MR. JUSTICE BURTON, with whom THE CHIEF JUSTICE and MR. JUSTICE REED join, dissenting.

In our opinion the judgment should have been affirmed. This is a case of a lawful arrest followed by a seizure of the instruments of the crime which then were in plain sight. There was no search. There is, therefore, no issue as to the need for a search warrant. In regard to the arrest, the only issue is as to the need for a warrant of arrest to make it lawful. For the reasons stated below, we believe the arrest for the crime committed in the presence of the officers was clearly lawful without the issuance of a formal warrant for it. At the time of the raid, there were sufficient grounds to justify the police in suspecting that the unlawful lottery, which later proved to be in operation, was in progress within the building which had

been under surveillance. A "numbers game," such as was there conducted, is a form of lottery generally regarded as detrimental to the communities where it flourishes. It is highly profitable to its principals at the expense of its players. Yet it is so simple in operation that its headquarters are readily movable. Accordingly, it requires substantial police effort to stop such unlawful operations at their source. It is difficult to locate the principals and it is still more difficult to secure proof sufficient to convict them unless they are arrested in the midst of one of the comparatively brief periodical sessions when the essential computations for the operation of the lottery are being made. Such sessions are held when the operators determine the day's winners and arrange for the distribution among those winners of their respective shares of the cash which has been collected through a network of writers, collectors and runners.

Under the circumstances, a prompt entry by the police was justified when they reasonably suspected that the crime of operating a numbers lottery was being committed at that moment. The petitioners, as tenants or occupants of a room, had no right to object to the presence of officers in the hall of the rooming house. The actual observance by the police of the commission of the suspected crime thereupon justified their immediate arrest of those engaged in it without securing a warrant for such arrest.

This case is primarily an instance where the police succeeded in surprising the petitioners in the midst of the unlawful operations which the police suspected were being carried on periodically by McDonald as a principal operator and by others at the place in question. It is generally not a violation of any constitutional privilege of the accused for a police officer to arrest such accused without a warrant of arrest if the arrest is made at the

very moment when the accused is engaged in a violation of law in the presence of the officer. It is generally not a violation of any constitutional privilege of such accused for the arresting officer thereupon to seize at least the articles then in plain sight and which have been seen by the officer to have been used in the commission of the crime for which the accused is being arrested. We see no adequate reason for a distinction in favor of the accused here. In this case there was no search for the seized property because its presence was obvious. Also, there was no seizure of anything other than the articles which the arresting officer saw in use in some material connection with the crime which the accused committed in the officer's presence. It, therefore, was not a violation of the constitutional rights of the accused to permit such seized articles to be presented in evidence in securing their convictions of the crimes which they were charged with committing in the presence of the arresting officer.