**UNITED STATES of America ex rel. Nicholas CARDAIO, Petitioner-Appellant,**

v.

**J. Leland CASSCLES, Warden of Sing Sing Prison, Respondent-Appellee.**

No. 448, Docket 35329.

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1971.

Decided June 22, 1971.

Thomas A. Shaw, Jr., New York City (Richard Landfield, New York City, on the brief), for petitioner-appellant.

Hillel Hoffman, Asst. Atty. Gen. of the State of New York (Louis J. Lefkowitz, Atty. Gen. of the State of New York, and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellee.

Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and McLEAN, District Judge.*

McLEAN, District Judge:

Petitioner is a state prisoner who is serving concurrent sentences of 7½ to 10 years and 5 to 10 years imposed upon him by the Supreme Court, Queens County, New York, upon his conviction in 1965 of the crimes of felonious possession of marijuana with intent to sell and felonious possession of marijuana. In July 1969 he filed a petition for a writ of habeas corpus in the District Court for the Southern District of New York, claiming that he had been arrested without a warrant and without probable cause, and that his conviction was secured by evidence obtained in violation of his rights under the Fourth Amendment. Judge Palmieri found it unneces-

---

* Of the District Court for the Southern District of New York, sitting by designation.

sary to hold a hearing on these claims. He accepted the facts as found by the state court in a series of hearings on petitioner's motion to suppress, in which petitioner made the same contentions that he makes here. The fairness of these hearings and the adequacy of their fact finding procedures were not challenged by petitioner. See 28 U.S.C. § 2254(d). On the basis of these facts, Judge Palmieri held that petitioner's constitutional rights had not been violated. He dismissed the petition by order dated October 16, 1969, with an opinion which is unreported.

In July 1970 this court granted a certificate of probable cause and thereafter assigned counsel to represent petitioner on his appeal. After examining the record, we agree with the district court's conclusion, and, accordingly, we affirm the order.

The proceedings in the state court, which were rather extensive, may be summarized as follows. Petitioner was indicted in the Supreme Court, Queens County, in October 1964. He moved in advance of trial to suppress the marijuana which the police had seized in his apartment at the time of his arrest on June 1, 1964. After a hearing held in January 1965, Mr. Justice Conroy denied the motion by order dated January 19, 1965. Petitioner was then tried and convicted by a jury verdict. He appealed from both the judgment of conviction and from the order denying his motion to suppress. The Appellate Division affirmed both. People v. Cardaio, 25 A.D. 2d 953, 272 N.Y.S.2d 112 (2d Dept. 1966). The New York Court of Appeals, however, withheld determination of the appeal and remanded the case to the Supreme Court, Queens County, for a further hearing on the motion to suppress. People v. Cardaio, 18 N.Y.2d 924, 276 N.Y.S.2d 1004, 223 N.E.2d 497 (1966).

A further hearing was held, again before Mr. Justice Conroy, in March 1967. In May 1967, he denied the motion for a second time. Although the Appellate Division affirmed his findings of fact, it nevertheless remanded the case for a

third hearing on the ground that a witness who had testified at the first hearing should have been permitted to testify again at the second. People v. Cardaio, 28 A.D.2d 1144, 284 N.Y.S.2d 940 (2d Dept. 1967).

The third hearing took place before Mr. Justice Shapiro in February 1968. Both sides rested on the record of the two previous hearings, except that petitioner introduced the minutes of a hearing on a motion to suppress made by Tod Konrad in another case. Konrad was a key figure in petitioner's case, as will presently appear. On February 23, 1968, the court denied petitioner's motion for a third time. The Appellate Division affirmed the order. People v. Cardaio, 30 A.D.2d 843, 294 N.Y.S.2d 579 (2d Dept. 1968). In April 1969, the New York Court of Appeals affirmed the judgment of conviction. People v. Cardaio, 24 N.Y. 2d 988, 302 N.Y.S.2d 818, 250 N.E.2d 227 (1969).

■ Petitioner began this federal proceeding within a few months after the Court of Appeals' decision. He did not seek a writ of error coram nobis in the state court. Nevertheless, both sides appear to assume that petitioner has exhausted his state remedies; at any rate no claim is made that he has not. We take the same view. Petitioner litigated his constitutional claim for over four years in the course of his direct appeal. It was finally determined against him by the state's highest court. No purpose that we can perceive would have been served by starting all over again on the coram nobis route. See Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 rehearing denied, 345 U.S. 946, 73 S.Ct. 827, 97 L.Ed. 1370 (1953).

The relevant facts were developed in a somewhat piecemeal fashion in the three suppression hearings. Some new facts were added at each successive hearing. Some were repeated in the testimony on the trial of the indictment. We have treated the state record as a whole, and regardless of the order in which the facts came out, we summarize them here in chronological order.

On June 1, 1964, the Manhattan police received information that narcotics could be found in an apartment at 31 Bedford Street, Manhattan. Lieutenant Mulligan and other officers went to that address. While they were waiting at the door of the apartment, Tod Konrad appeared. In answer to the officer's inquiry, Konrad said that he had marijuana in his apartment. He further remarked that he was "a nervous wreck" because the night before he had been "stuck up" and robbed of approximately eight pounds of marijuana. He said that one of his assailants was armed with a gun. He characterized this man as a "beatnik type of kid," with long hair, about twenty years old, whose name was Nick. He gave the officers Nick's telephone number. It was a Queens number.

Lieutenant Mulligan thereupon telephoned his office in Manhattan and spoke to Detective King, a Queens detective, who happened to be there. Mulligan told King what he had learned from Konrad. He told him that he had received a complaint from a man who said he had been assaulted and robbed of marijuana and that "there was a gun involved in the case." He instructed King to find out from the telephone company whether the telephone number belonged to someone named Nick and if so, to ascertain the address and to proceed to that address with his partners or "whoever he could get his hands on" to make observations. This conversation occurred at approximately 5:15 P.M.

Detective King ascertained that the telephone number was that of Nicholas Cardaio of 43–10 Auburndale Lane, Queens. Petitioner lived at that address, a two-family house. The other apartment in the house was occupied by petitioner's father, also named Nicholas Cardaio. It is not entirely clear whether the telephone number was that of the father or the son.

King collected two other Queens detectives, Arrington and Rannie, and all three drove to 43–10 Auburndale Lane where they arrived at about 8:00 P.M. They did not obtain either an arrest warrant or a search warrant. They parked their car across the street and took up observation. At about 8:30 P.M., a man came out of the building. The officers followed him and brought him back, but he turned out to be no one more sinister than a tailor.

King then decided upon a more aggressive course. He knocked at the door which was opened by a woman, later discovered to be petitioner's aunt, who shortly was joined at the door by petitioner's wife. King asked if Nick was home. The aunt answered, "Yes, just a minute." King then announced that he was a police officer and that he had come "to lock up Nick." Thereupon he walked in. The two women apparently did not protest, but it would doubtless be stretching matters somewhat to say that they invited him in. Arrington and Rannie followed King within two or three minutes.

Petitioner had just emerged from the shower and was found in the apartment draped only in a towel. King placed him under arrest, handcuffed him and proceeded to search the apartment, looking for a gun. He found none. King testified that he asked petitioner where it was and that petitioner said that he had thrown it in a vacant lot the night before. King further testified that he asked petitioner where the marijuana was and that petitioner pointed to a shopping bag in a closet. This shopping bag contained eight bags of marijuana weighing 6⅜ pounds in all. According to King, on their way to the station house, petitioner showed the police the vacant lot where he said he had thrown the gun, but the officers did not find it.

Petitioner was arraigned in Queens County on the marijuana charges and in New York County on the robbery charge. The latter eventually was dropped because Konrad refused to sign a complaint. Konrad was charged with possession of narcotics, but the charge against him was perforce dismissed when his motion to suppress the narcotics seized in his apartment was granted.

Konrad testified at the first suppression hearing and denied that he knew "Nick" or that he had told Lieutenant Mulligan about him. Petitioner also testified. His testimony was at sharp variance with King's. He denied the robbery and explained his possession of the marijuana by stating that on May 31, 1964, a man named Williams, whose address he did not know, had asked him to keep it for him. Mr. Justice Conroy believed the testimony of the police officers and expressly rejected that of petitioner and Konrad, as he had the right to do.

■ On these facts petitioner makes three contentions. His first claim is that because the state court held in Konrad's case that the narcotics found in Konrad's apartment had been illegally seized, therefore the information given by Konrad to the police about petitioner cannot be considered in deciding whether the police had probable cause to believe that petitioner had committed a crime. This is on the theory that the information obtained from Konrad was the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We may assume that Konrad's statements to the police concerning petitioner can properly be said to be the "fruit," as that word is defined in *Wong Sun*, of the officers' action in entering and searching Konrad's apartment without a warrant, although the point is not wholly free from doubt. Nevertheless, petitioner is not in a position to profit by this fact. It was Konrad's apartment that was searched, not petitioner's, and the Fourth Amendment rights which that search was held to have violated were Konrad's rights, not petitioner's. The product of the illegal search could not have been used against Konrad, but it may be used against petitioner. This is because petitioner has no standing to complain of or take advantage of the infringement of someone else's rights. This principle is well settled. Alderman v. United States, 394 U.

S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); see Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). This court's decision in United States v. Edmons, 432 F.2d 577 (2d Cir. 1970), relied upon by petitioner, holds nothing to the contrary.

■ Petitioner's second claim is that the information which Konrad gave the police was not sufficient to constitute probable cause for them to believe that petitioner was the armed robber who had taken the marijuana from Konrad. Petitioner argues that the information failed to satisfy either of the two criteria developed in the search warrant cases for determining the adequacy of an informant's information which is used as a basis for a police officer's affidavit, i. e., (1) that there be some statement of the underlying circumstances from which the informant concluded that the facts were as he stated them to be, and (2) that there be some reason for believing the informant credible or his information reliable. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); see also Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

We think it clear that the first requirement was met here. Konrad's information was firsthand. It was based on his personal knowledge. He said that the marijuana had been taken from him by a robber at gunpoint. He gave the police a description of his assailant as a young man, about twenty, a "beatnik type" with long hair. He furnished his name, "Nick," and his telephone number. Investigation confirmed that the telephone was listed under the name of a "Nick," i. e., Nicholas Cardaio. When the officers arrived at the Auburndale Lane house, they inquired if "Nick" was there and were told that he was. Upon entering, they observed petitioner, who presumably conformed to Konrad's description.[1] The fact that there was another

---

1. We have been unable to find any explicit testimony in the record as to petitioner's age or as to the length of his hair. Since petitioner testified at the hearing, the court was in a position to observe these matters for itself. No claim is made that Konrad's description did not fit petitioner.

Nicholas Cardaio, petitioner's father, at that address, is immaterial. The description obviously could not apply to the father. There is no doubt that Konrad's information led the police directly to petitioner. It was sufficient to induce a reasonable belief on their part that petitioner was the man who had committed the crime.

■ As to the second requirement, we have found no case in which evidence of previous reliability of the informant has been thought necessary where the information comes from the person who is himself the victim of the crime about which he complains. To require such proof would create a standard impossible of attainment, as a practical matter, for, as has been pointed out:

"Most victims of crime are total strangers to arresting officers as are most of the persons they arrest." Pendergrast v. United States, 135 U.S. App.D.C. 20, 416 F.2d 776, 785 (1969), cert. denied, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969).

In United States ex rel. Walls v. Mancusi, 406 F.2d 505 (2d Cir. 1969), cert. denied, 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969), this court found probable cause where the victim of a holdup, previously unknown to the police, told a nearby policeman of the attack and gave a description of the assailants. To be sure, the culprits were still in sight and were observed running away, thereby tending to corroborate the victim's accusation. We do not regard that fact, however, as such a vital distinction as to require a different result in the present case. In *Pendergrast*, the victim picked out the defendant from a crowd of onlookers, and defendant stoutly denied the accusation prior to his arrest. In Brown v. United States, 125 U.S.App. D.C. 43, 365 F.2d 976 (1966), information broadcast over a police radio which

came from an unknown victim, reporting a robbery and giving a somewhat inaccurate description of the defendant and his automobile, was held sufficient. The court pointed out that "the victim's report has the virtue of being based on personal observation," and "is less likely to be colored by self-interest than is that of an informant." 365 F.2d at 979.

We hold that the police were entitled to rely upon Konrad's information and that it afforded them probable cause to arrest petitioner. As far as this claim is concerned, therefore, the arrest was valid, and the search of petitioner's apartment for the gun and, for that matter, for the marijuana, if indeed there was a search for the latter, was valid as an incident to the arrest.[2]

■ Petitioner's third claim is that because the arrest and the search occurred in petitioner's home, the police were required to obtain an arrest warrant and a search warrant, and their failure to obtain either violated petitioner's Fourth Amendment rights. The claim is based primarily upon McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), which held that, under the circumstances there presented, the privacy of the home may not be violated without a warrant except in "some grave emergency," and that there must be "a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." 335 U.S. at 455, 456, 69 S.Ct. at 193.

We think that the evidence was strong enough to satisfy the *McDonald* test, even if we should assume all that was said in that case to be applicable to an entry effected as it was here, cf. United States v. McMillan, 368 F.2d 810, 812 (2d Cir. 1966), cert. denied, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 1783 (1967). This case involves more than a mere hunt for

---

2. This incident occurred prior to the decision in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), hence we need not consider the doctrine of that case with respect to the permissible scope of the search. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969).

contraband. The police were looking for a robber, known to be armed. The arresting officers first learned of the situation after five o'clock in the afternoon. To prepare an affidavit to obtain a search warrant would have been time-consuming, and to find a magistrate at that hour to issue the warrant would have involved further delay. Indeed, it seems probable that a warrant could not have been secured until the following day. In the meantime, petitioner would have had ample opportunity to escape. Prompt action was necessary. We believe that it can fairly be said that "the exigencies of the situation" made it imperative for the police to proceed at once, without attempting to obtain a warrant.

In *McDonald,* the officers had been watching defendant's house for some two months before they finally entered without a warrant. In Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), also cited by petitioner, a government agent in disguise had worked with defendant in the operation of an illegal still for several weeks before the warrantless raid was launched. The opportunity in those cases for obtaining a warrant before entering defendant's home was far greater, and the need for haste was much less, than it was here. Those cases fall on one side of the line. We believe that the present case properly falls on the other.

We take this opportunity to express our gratitude to petitioner's assigned counsel, Thomas A. Shaw, Jr., Esq., for his able brief and argument on petitioner's behalf.

The order is affirmed.

WATERMAN, Circuit Judge (dissenting):

I respectfully dissent.

I deem McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), to be controlling. As stated in McDonald, at 455, 69 S.Ct. at 193:

Here, as in Johnson v. United States [333 U.S. 10, [68 S.Ct. 367, 92 L.Ed. 436] (1948)] and Trupiano v. United States [334 U.S. 699, [68 S.Ct. 1229, 92 L.Ed. 1663]. (1948)], the defendant was not fleeing or seeking to escape. Officers were there to apprehend petitioners in case they tried to leave. Nor was the property in the process of destruction nor as likely to be destroyed as the opium paraphernalia in the Johnson case. * * * No reason, except inconvenience of the officers and delay in preparing papers and getting before a magistrate, appears for the failure to seek a search warrant. But those reasons are no justification for by-passing the constitutional requirement [of getting a search warrant], as we held in Johnson v. United States, supra, 333 U.S. at page 15, 68 S.Ct. at page 369.

Here, the robbery of Konrad by Cardaio which Konrad reported to the police on the afternoon of June 1 at Konrad's apartment had occurred the previous night. This was not the "hot" report of a frightened victim who had just been stuck up and robbed at gunpoint. And, except for the fact that he had been arrested and was in the custody of Lt. Mulligan's patrol, it is highly unlikely that Konrad would have ever confessed to have illegally possessed eight pounds of marijuana and have been "robbed" of the contraband. Quite obviously, it seems to me, Cardaio could not have supposed that he would be informed upon and could not have expected that he would be the object of a robbery investigation by the police; hence not even the police could believe that Cardaio feared arrest or would attempt immediate flight, or would hastily destroy the marijuana claimed to have been forcefully taken from Konrad. Moreover, from the leads given by Konrad, Detective King, by quick and effective police work, was in possession of all pertinent information needed to obtain both an arrest warrant for Cardaio and a search warrant for 43–10 Auburndale Lane.

Additionally, as in *McDonald,* the premises were soon under surveillance and it is inconceivable that a search

warrant could not have been safely obtained between the time the premises were identified and consultative plans could safely be made for a night-time search. As the majority opinion points out, after nightfall King ("whose job is the detection of crime and the arrest of criminals") decided upon a more aggressive course and the majority would justify this action by holding "that the exigencies of the situation made that course imperative."[1]

I submit that it strains credulity to say that any "emergency" existed here so as to justify the officers' violation of the well-known fundamental right of a person to be secure in his home from unreasonable searches in the night-time.

The majority, despite *McDonald*, relies upon the Second Circuit case of United States v. McMillan, 368 F.2d 810 (1966) an arrest and search conducted after there had been four sales of narcotics by McMillan to a federal narcotics agent. There, after the sales, which, of course, identified McMillan as a dealer, the agents, pursuant to the power specifically granted to federal narcotics agents under 26 U.S.C. § 7607, made a warrant-less arrest. Such an arrest was permissible "for violations of any law of the United States relating to narcotic drugs" when the agents "believe that the person to be arrested has committed or is committing such violations." Inasmuch as four sales had been made to an agent, this statute on its face authorized the agents, whenever they wished to act, to arrest McMillan and then to conduct an incidental search for narcotics in the premises where he was living. Here the officers were policemen of the City of New York, and the warrantless search they conducted was to find a gun and was not for the purpose of uncovering marijuana.

I would reverse and remand with instructions to issue the writ of habeas corpus, unless the State promptly retries appellant without the use of the marijuana unconstitutionally seized. See my dissent in DiBella v. United States, 284 F.2d 897, 904–909 (2 Cir. 1960), rev'd, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); see also United States v. Baca, 417 F.2d 103 (10 Cir. 1969); Niro v. United States, 388 F.2d 535 (1 Cir. 1968).

---

1. As stated in McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153, this is the single permissible exception to the requirement that a search requires the advance delivery to the searching officers of a search warrant issued by a magistrate. In fact, it is not amiss to quote the portion of the *McDonald* opinion immediately following the quotation at the beginning of this dissent and ending with the quotation here noted:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative. 335 U.S. at 455, 456, 69 S.Ct. at 193.