**UNITED STATES of America**

v.

**Kelley DAVIS a/k/a Tee, Appellant in No. 71–1778, and Inez Davis.**

**Appeal of Inez DAVIS, in No. 71–1779. Nos. 71–1778, 71–1779.**

United States Court of Appeals, Third Circuit.

Argued Jan. 6, 1972.

Decided May 31, 1972.

---

1028

Lloyd F. Engle, Jr., Kuhn, Engle & Blair, Pittsburgh, Pa., for appellants.

Charles F. Scarlata, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before KALODNER, GANEY* and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

Kelley Davis and Inez Davis appeal from the denial of their motion for judgment of acquittal and motion for a new trial after they were found guilty under a multi-count indictment charging them with receiving and concealing narcotic drugs in violation of 21 U.S.C. § 174 and of possessing narcotic drugs not in or from the original stamped package in violation of 26 U.S.C. § 4704(a).[1] Judge Teitelbaum's opinion denying their motions in the district court is reported at 329 F.Supp. 493 (W.D.Pa.1971).

This appeal raises two questions: (1) the denial of a motion to suppress evidence allegedly seized in contravention of the Davises' fourth amendment rights; and (2) the inadequacy of the evidence on which the jury could find Inez guilty. Both questions must be answered in favor of the Government.

## I. THE WARRANTLESS ARREST AND SEARCH

### A. *Probable Cause for Arrest*

On June 19, four agents of the Bureau of Narcotics and Dangerous Drugs ("BNDD") and the Chief of Police of Braddock, Pennsylvania, arrested Kelley and Inez in Inez' apartment in Braddock. When they were arrested, the agents found sizeable quantities of heroin on Kelley and within the area immediately under the control of Kelley or Inez. These seizures were the basis for the federal prosecution. The agents had

---

* Judge Ganey heard the argument and participated in the consideration of this appeal but died before final disposition.

1. Inez Davis is the daughter of Kelley Davis. To avoid needless repetition, we shall refer to them by their first names. Kelley was charged under counts 1–10 of the indictment with violations of 21 U.S.C. § 174 and 26 U.S.C. § 4704(a). Inez was charged under counts 3 and 4, and 7 through 10. Counts 3 through 10 also charged a violation of 18 U.S.C. § 2. The jury found both Inez and Kelley guilty under counts 3–10, but found Kelley not guilty of counts 1 and 2. Judge Teitelbaum granted a motion for acquittal with regard to counts 7 and 8.

neither a search nor an arrest warrant when they entered the apartment.

Appellants contend that the agents did not have probable cause for an arrest or search, and that in any case, the agents had not shown that it was reasonable to proceed without a warrant. Unless this search was incident to a lawful arrest, they argue the evidence must be suppressed.

The arrest took place in Inez' apartment in the evening. Generally, the need for a warrant for such an arrest is still an open question in fourth amendment law. Coolidge v. New Hampshire, 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1957). However, Mr. Justice Stewart, speaking for himself and three other justices and with the concurrence of Mr. Justice Harlan, noted in Coolidge v. New Hampshire, supra, 403 U.S. at 477–478, 91 S.Ct. at 2044, that:

> . . . [T]he notion that the warrantless entry of a man's house in order to arrest him on probable cause is *per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined "exigent circumstances."

*See also*, McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The Court of Appeals for the District of Columbia has in fact adopted this rule, requiring the issuance of a warrant before a seizure can take place in a man's own home. Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970).

However, all these cases note that in certain situations, generally grouped under the heading "exigent cir-

cumstances," there need be no warrant. The fourth amendment protects only against unreasonable searches and seizures. It, therefore, requires the police to obtain warrants only when they have time and opportunity to do so without obstructing their efforts to apprehend criminals and the evidence or fruits of their crimes. Therefore, when officers are in "hot pursuit" of a criminal, Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), when they "stop and frisk," Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or when their attempt to secure a warrant might delay them sufficiently to cause the criminal to get away or destroy the fruits or evidence of his crime, Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States ex rel. Cardaio v. Casscles, 446 F.2d 632 (2d Cir. 1971); United States v. Titus, 445 F.2d 577 (2d Cir. 1971), they may proceed without a warrant.[2]

This case comes within the last exception. On June 19, 1970, Agent D'Addio of the Pittsburgh office of the BNDD received a telephone call around 6:45 P.M. from an informant stating that Inez had gone to New York to pick up a shipment of heroin. She was to return that evening. Agent D'Addio immediately dispatched four fellow agents to the Greater Pittsburgh Airport to intercept Inez on her return.

Within an hour of the first call, the informant called again to tell D'Addio that Inez had already returned from New York. She was said to be back at the apartment at 26 Braddock Avenue "cutting" the heroin for immediate distribution. The informant warned the BNDD agent that if he did not hurry to the Braddock address, the heroin would be "on the street."

D'Addio conferred with his superior who ordered him to make an immediate arrest. Time was of the essence.

---

2. The same exceptions are generally applicable for a lawful search without a warrant, but in that category is the additional exception of a search otherwise incident to a lawful arrest. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

D'Addio testified at the suppression hearing that it takes only about fifteen minutes to "cut" an ounce of heroin and prepare it for retail sale. The nearest United States Commissioner was approximately forty-five minutes away at his home in suburban Pittsburgh. Although a United States district judge might have been closer, Agent D'Addio stated that it would still take time to find someone, prepare a statement, and type it up.

Instead of doing that, he called the agents at the airport and asked them to go immediately to the Braddock area to rendezvous with him near the apartment. He also asked the Chief of Police of Braddock to meet him. Defense counsel suggested at the suppression hearing that this local officer could have obtained a state warrant from the magistrate in Braddock. However, Agent D'Addio noted that the chief did not have all the information necessary to obtain a warrant and that he, D'Addio, was not going to explain all the details over the telephone for fear that there might be a "leak."

Taking all these facts into consideration, we find that the federal agents acted reasonably in proceeding to the apartment to make the arrest without a warrant. The situation is analogous to the dilemma presented to the officers in United States ex rel. Cardaio v. Casscles, supra. In that case, the court approved the warrantless arrest because the preparation of the affidavit and the searching out of a magistrate would have given the defendant a considerable amount of time to effect his escape. *See also* United States v. Sherman, 430 F.2d 1402, 1406 (9th Cir. 1970); cert. denied, 401 U.S. 908, 91 S.Ct. 865, 27 L.Ed.2d 805, rehearing denied, 401 U.S. 1015, 91 S.Ct. 1249, 28 L.Ed.2d 552 (1971). In our case, although defendant

had been under surveillance for several months the police had only short notice of the fact that he was in the process of packaging heroin for distribution. Their quick action was imperative, and therefore justified, to prevent the completion of the crime and the disappearance of the evidence. United States v. Burrus, 306 F.Supp. 915 (E.D.Pa.1969). In this regard, the situation is different from Coolidge v. New Hampshire, supra, and McDonald v. United States, supra, where the defendants posed no immediate threat to escape or destroy evidence or the fruits of the crime. While in retrospect, a judge might conclude that the BNDD agents could have obtained a warrant without delay prior to making the arrest, that does not change the result. United States v. Titus, supra, 445 F.2d at 579. The arrest was legally made without a warrant because at the time the agents reasonably believed that their immediate action was necessary to avoid the removal of the heroin from the apartment for sale.

In any case, under 26 U.S.C. § 7607(2), as in effect at the time of these arrests,[3] agents of the BNDD could make an arrest without a warrant if they had "reasonable grounds to believe that the person to be arrested has committed or is committing [a narcotics] violation." This statute, whose constitutionality has been repeatedly upheld, United States v. Squella-Avendano, 447 F.2d 575, 578 (5th Cir. 1971), cert. denied 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (Dec. 7, 1971); Spurlock v. United States, 295 F.2d 387 (9th Cir. 1961), cert. denied, 369 U.S. 877, 82 S.Ct. 1149, 8 L.Ed.2d 280 (1962),[4] accommodates the needs of law enforcement officials to the difficult problems in dealing with narcotics. United States v. Squella-Avendano, supra, 447 F.2d at 578–579. Because of the speed with which narcotics can be dispersed or

3. Subsequent to June 1970, 26 U.S.C. § 7607(2) was amended by the Drug Control Act of 1970. Pub.L. 91–513, 84 Stat. 1293.

4. The statute has been before the Supreme Court several times without comment on its constitutionality. See, e. g., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958).

destroyed, agents must be able to move as quickly as possible. United States v. Santiago, 327 F.2d 573 (2d Cir. 1964). The law in effect, recognizes that whenever the Government attempts to control narcotics and narcotics peddlers, it is dealing with a type of exigent circumstance, the disappearance of evidence or contraband, long recognized as creating an exception to the need for an arrest or search warrant. Ker v. California, 374 U.S. 23, 42, 83 S.Ct. 1623, 10 L.Ed. 2d 726 (1963).[5]

■■ Even if the agents could dispense with a warrant, nonetheless we must determine whether at the moment of the arrests the facts and circumstances within the knowledge of the agents and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the appellants had committed, or were committing an offense against the United States. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).[6] Although 26 U.S.C. § 7607 (2) speaks in terms of "reasonable grounds" rather than the traditional formulation of probable cause," the two standards have been held substantially equivalent, Draper v. United States, 358 U.S. 307, 310 n. 3, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Ng Pui Yu v. United States, 352 F.2d 626 (9th Cir. 1965).[7] Therefore, the traditional fourth amendment test applies even to arrests conducted under the authority of the foregoing section.

Kelley had been under police surveillance for several months. Agent D'Addio testified at the suppression hearing that an informant had come to him in February 1970 with information that Kelley was setting up a narcotics operation in the Braddock area. In the next two months, the informant arranged two "buys" for Allegheny County police and the BNDD from Kelley. This information culminated in Kelley's arrest on March 29, 1970, by Pennsylvania authorities for narcotics violations.

He was released on bail, but the BNDD was informed by the Braddock Chief of Police, the Allegheny County Narcotics Bureau and a second informant that Kelley continued to traffic in narcotics. This second informant had not previously worked with the BNDD but he had been referred to that agency by the FBI, which had found him reliable. According to D'Addio, the informant was well placed to know what was happening to the narcotics traffic in the Pittsburgh area.

The two informers, operating wholly independently of each other, supplied the BNDD with valid information about four or five narcotics traffickers other than the Davises. In May of 1970 the second informant supplied sufficient information to the agency to secure a search warrant for Inez' apartment at 26 Braddock Avenue. However the warrant was not executed within its ten day life span because no drugs were thought to be in the apartment at that time.

On June 17 the first informant tried to arrange another "buy" for the BNDD from Kelley, but the latter grew suspicious and called off the deal.

■■ By the time the second informant called D'Addio on the night of June 19 we believe that he had established himself as a trustworthy and reliable

---

5. Mr. Justice Clark noted in Ker that the potential destruction of narcotics at the time of arrest presented an exigent circumstance justifying a search without a warrant. 374 U.S. at 42, 83 S.Ct. 1623. The House of Representatives report accompanying the Drug Control Act of 1970, supra, note 3, adopted this reasoning to justify parts of that Act. 1970 U.S.Cong. and Admin.News, pp. 4566, 4591–92.

6. *See also* Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L. Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

7. Further, the analysis for probable cause for an arrest and probable cause for search are basically similar, and therefore cases analyzing searches as well as arrests will be considered. Spinelli v. United States, 393 U.S. 410, 417 n. 5, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969).

informant. His other information concerning Kelley had been independently corroborated; he had supplied credible information concerning other drug peddlers; and his credentials had previously passed muster before a magistrate in May when the lapsed search warrant was issued. These facts were sufficient to meet one prong of the two prong test announced in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), for assessing the reliability of an informant's tip. That prong requires that the informant be shown to be credible and his information reliable, and this record satisfies that test.

However, nothing satisfies the other prong of *Aguilar's* test. There is nothing in the record to show the informant procured his information in a reliable way, and, therefore, the police may have been acting solely on the basis of "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Notwithstanding, this information can be used as part of the basis for probable cause when the police can independently verify other criminal or abnormal activity by the suspect which takes on a suspicious cast in light of the tip. Id., at 418, 89 S.Ct. 584, 589; Cf. McCray v. Illinois, 386 U.S. 300, 302, 87 S.Ct. 1056, 18 L.Ed. 2d 62 (1967).

While none of the specific information relayed in the telephone calls was corroborated before the agents arrived at the apartment, once they arrived they obtained more than sufficient corroboration of incriminating activity to sustain a finding of probable cause. While four agents were walking up the common stairs in the building, a bag of heroin was thrown out of the apartment window into the street. Before the agents inside reached the door, one of the agents remaining downstairs shouted up after them: "We have got it," or something to the effect that heroin had been thrown out of the window.[8] This information alone would have been enough to sustain a belief that a felony was being committed, and it was certainly sufficient to corroborate the informant's story. At this moment, the agents had not yet entered the apartment. Finally, when they approached the apartment door, they heard running and scuffling inside. The agents were entitled to rely on their knowledge of the operations of narcotics traffickers that such noise might well indicate an effort to dispose of the narcotics and escape. Such "deliberately furtive actions . . . at the approach of . . . law officers are strong indicia of *mens rea,* and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of the crime, they are proper factors to be considered in the decision to make an arrest." Sibron v. New York, 392 U.S. 40, 66–67, 88 S.Ct. 1912, 20 L. Ed.2d 917 (1968). United States v. Manning, 448 F.2d 992, 999 (2d Cir. 1971) (en banc).

Any problems with the reliability of the informer might have been cleared up at the suppression hearing, had it not been for defense counsel's objection to the Government's offer of *in camera* disclosure of the identity of the informant to the judge. The Government, however, refused to disclose the informant's identity to the defense, as was their privilege unless the disclosure "is relevant and helpful to the defense of [the] accused, or is essential to a fair determination of a cause . . ." Roviaro v. United States, 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). Accord, United States v. Ferrone, 438 F.2d 381 (3d Cir. 1971), cert. denied, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971).[9] Having denied the Govern-

---

8. This piece of information did not come out at the suppression hearing. Agent Ashton so testified at trial. However, because the incident was known to the agents at the time they entered the apart- ment to make the arrest, we can consider it to establish probable cause.

9. The judge at the suppression hearing told counsel that if anything revealed by the

ment the opportunity to establish completely the identity of the informant and the underlying circumstances that would perhaps have substantiated the reliability of the information, the defense must now bear the burden of any doubt it has created.

### B. *The Forcible Entry*

When BNDD Agent Ashton knocked on the door and said, "Federal Agents, open the door, Kelley," no one opened it. The agents continued to hear scurrying around inside. They had to make a forcible entry, and the validity of that entry must be shown, wholly apart from the validity of the arrest. United States v. Cisneros, 448 F.2d 298, 303 (9th Cir. 1971). Were the entry illegal it would require the exclusion of evidence subsequently seized. Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed. 2d 828 (1968); United States v. Case, 435 F.2d 766 (7th Cir. 1970).

The issue was not considered below or raised directly here on appeal, leaving us the option of not dealing with it unless it is "plain error." United States v. Todaro, 448 F.2d 64, 67–68 (3d Cir. 1971); United States v. Carter, 401 F.2d 748, 750 (3d Cir. 1968), cert. denied, 393 U.S. 1103 89 S.Ct. 905, 21 L.Ed.2d 797 (1969). We simply note that this breaking was legal under the standards set down by the Supreme Court in interpreting 18 U.S.C. § 3109,[10] the statute authorizing federal officers to break and enter to execute a warrant.[11]

This section generally requires that before an officer enter a dwelling by breaking, he must announce his authority and purpose to those within. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). In this case, the agents announced their authority but did not announce their purpose. However, there are common law exceptions to the requirement which were announced by Mr. Justice Brennan in his dissent in Ker v. California, supra, 374 U.S. at 47, 54–57, 83 S.Ct. 1623, and adopted in the majority opinion in Sabbath v. United States, supra, 391 U.S. at 591 n. 8, 88 S.Ct. 1755. One of those exceptions fits this case. When those inside a dwelling are aware of the presence of law enforcement officers and engage in loud noises or running that would indicate an attempt to escape or destroy evidence, it is reasonable for the police to dispense with the announcement. Between the tossing of the heroin out the window and the scurrying in the apartment, the police were more than justified in drawing either of these necessary conclusions.[12]

### C. *Search Incident to Arrest*

Finally we note that all the evidence was properly seized incident to the lawful arrest. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Although the evidence was all within the "plain view" of the BNDD agents when they rushed into the apartment, it might not be admissible under

---

informer during the in camera hearing was prejudicial, he would reveal it to him immediately. This assurance conformed to this court's holding in United States v. Jackson, 384 F.2d 825 (3d Cir. 1967), cert. denied, 392 U.S. 932, 933, 88 S.Ct. 2292, 20 L.Ed.2d 1390 (1968).

10. 18 U.S.C. § 3109, reads as follows:
    The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.
    The same standard applies to the execution

of arrest warrants. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L. Ed.2d 1332 (1958).

11. The law governing execution of warrantless arrests by breaking and entering is governed by the same standard. Sabbath v. United States, 391 U.S. 585, 588, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

12. Congress has concluded that announced entries pose such a great problem in narcotics cases because of the potential destruction of evidence that it passed a "no-knock" provision obviating the announcement requirement as part of the Drug Control Act of 1970. Section 509(b). See note 5, supra. We express no view on the constitutionality of that statute.

that exception to the search warrant requirement because the discovery was not "inadvertent," as is required by the plurality opinion in Coolidge v. New Hampshire, supra, 403 U.S. at 464–473, 91 S.Ct. 2022. The agents obviously believed the heroin would be there. However, most of the heroin was found on the table in the kitchen, the room in which Kelley and Inez were arrested while trying to destroy the drugs.[13] The rest of it was found on Kelley's person. All of. this area was within easy reach of the defendants and under their control.[14] It was therefore within the area of a proper search incident to a lawful arrest. Chimel v. California, supra.

We hold that there was a lawful warrantless arrest made with probable cause, and all the evidence seized was incident to that lawful arrest.

## II. SUFFICIENCY OF THE EVIDENCE

As to her motion for judgment of acquittal, Inez claims that the only evidence implicating her in the six counts in which she is named a co-defendant is that she lived in the apartment comprising part of the premises known as 26 Braddock Avenue and that she was present there at the time of the warrantless arrest and seizure. According to the instructions given it by the trial court, the jury could not have rendered a guilty verdict against either defendant under any count unless it found or inferred from the evidence that he or she had possession of the heroin under that count. Therefore, we must ascertain whether the jury could properly infer from the evidence that Inez had possession of the narcotic drug under each count for which she was found guilty.

"Possession" of a narcotic drug under the statutes involved is sufficient to allow conviction unless the one charged with possession explains it to the jury's satisfaction.[15] Proof of actual possession need not be shown; it may be established by circumstantial evidence. United States v. Raysor, 294 F.2d 563 (3d Cir. 1961); United States v. Malfi, 264 F.2d 147 (3d Cir. 1959), cert. denied, 361 U.S. 817, 80 S.Ct. 57, 4 L.Ed.2d 63 (1959). *See also,* United States v. Bridges, 419 F.2d 963 (8th Cir. 1969); Smith v. United States, 385 F.2d 34 (5th Cir. 1967). The evidence must be such, however, that a jury may infer that the person charged with possession had dominion and control of the narcotic drug, United States v. Gary, 447 F.2d 907, 909 (9th Cir. 1971); Brothers v. United States, 328 F.2d 151, 155 (9th Cir. 1964), or that he knowingly had power to exercise dominion and control over the drug. Amaya v. United States, 373 F.2d 197 (10th Cir. 1967). Such dominion and control need not be exclusive but may be shared with others. Brothers v. United States, supra, 328 F.2d at 155.

13. A third person, Gloria Anderson, was in the apartment, in the living room, at the time of the arrests. She too was arrested, but a search of the area under her control revealed no evidence used in this case. Kelley asked that she be let go because she was not involved in the transaction, and she was not indicted. As will be noted later, Inez contended on the witness stand that it was Gloria Anderson, not she, who was involved in the drug ring.

14. One piece of evidence in the kitchen which might not have been within the immediate control of the defendants was the glassine bag found under the window in the kitchen. Were it not for the plurality's ruling in Coolidge v. New Hampshire, 403 U.S. 443, 463–473, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), this evidence would be clearly admissible because it was in the plain view of BNDD Agent Ashton when he went to the window to call to the other agents still down on the street. United States v. Titus, 445 F.2d 577, 579 (2d Cir. 1971). However, we need not concern ourselves with this question because Judge Teitelbaum granted defendants' motion for acquittal on the counts involving this evidence. The other evidence not within the immediate control of the defendants was the heroin thrown into the street. The jury returned a verdict of not guilty on the counts based on that evidence.

15. Under 26 U.S.C. § 4704(a) it is also necessary to prove by direct evidence that the narcotic drug was unstamped. Harris v. United States, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959).

On the other hand mere proximity to the drug, or mere presence on the property where it is located or mere association with the person who does control the drug or the property, is insufficient to support a finding of possession. See, e. g., United States v. Holland, 144 U.S. App.D.C. 225, 445 F.2d 701 (1971); Arellanes v. United States, 302 F.2d 603, 606 (9th Cir. 1962); United States v. Mills, 293 F.2d 609 (3d Cir. 1961).

When the agents entered the living room of the three room apartment, defendants stood around a rectangular table in the kitchen while a third person, Gloria Anderson,[16] was standing in the living room near the doorless kitchen entrance. Upon entering the kitchen, the agents saw the diluted heroin, both in loose form and in glassine bags on the table which occupied a large portion of the area in the small kitchen. It appeared that someone recently had been in the process of placing small measured doses of a powdery mixture in glassine bags. Measuring spoons, mixing paraphernalia and a number of empty glassine bags were on the table. Measured amounts had been placed in fifteen of the bags. The agents also confiscated a bundle of forty-six bagged heroin doses lying on the floor near the foot of the refrigerator. The Government offered no proof other than the circumstantial evidence of possession from which the jury could infer that Inez knew that the heroin was illegally imported. It relied solely on the presumption of knowledge of illegal importation arising from unexplained possession of heroin permitted in Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).[17]

Inez took the stand in her own behalf and admitted that the apartment was her home. Her explanation to the charges was that she was preparing supper and that the mixing and packaging of heroin were being performed by Gloria Anderson. The latter she said had come from New Orleans a few months ago and that at Kelley's request she had permitted her to stay at the apartment temporarily until she found a more permanent place to live. She also testified that she did not know what the powdery substance on the table was until Gloria admitted to Kelley that it was heroin, and that when he learned what she was doing, he flew into a rage and began throwing some of the glassine bags onto the floor.

■■ The facts and inferences in this record must, for the purpose of this appeal, be construed in the light most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Under the circumstances we think the jury could have inferred that she knowingly had the power to exercise and control the heroin mixture, either alone or together with her father.

Appellants assign no ground as to why the trial court allegedly abused its discretion in denying their motion for a new trial. The trial court did not commit plain error in doing so.

The judgments in each case will be affirmed.

---

16. See supra, note 13.

17. In some of the circuits failure to so charge under these circumstances is reversible error. See United States v. Steward, 451 F.2d 1203, 1206–1208 (2d Cir. 1971); Hernandez v. United States, 300 F.2d 114 (9th Cir. 1962). See also United States v. Gary, 447 F.2d 907, 911–912 (9th Cir. 1971).