**UNITED STATES of America,**
**Plaintiff,**

v.

**Nolan Edward BREWER et al.,**
**Defendants.**

**Crim. No. 12945.**

United States District Court,
D. Hawaii.

April 28, 1972.

Robert K. Fukuda, U. S. Atty., Walter M. Phillips, Jr., Sp. Asst. U. S. Atty., Honolulu, Hawaii, for plaintiff.

John S. Edmunds, Honolulu, Hawaii, for defendants.

## MEMORANDUM DECISION

PENCE, Chief Judge.

Defendant moved under Rule 41(e) of F.R.Crim.P. to suppress as evidence certain marihuana seized by the government during a search of his home. A hearing was held on February 4, 1972, when, in view of the government's failure to submit any memorandum in opposition to defendant's motion, this court requested the Ass't. U. S. Attorney to set forth his version of the facts. He was then assisted by Special Agent Quintal of the Bureau of Narcotics & Dangerous Drugs, who was not only in charge of the investigation, but was also personally involved in the contested search and the events leading up to it. The court allowed the Ass't U. S. Attorney to converse with Quintal in court as to the sequence of events; therefore the court did not ask Quintal to testify. For the disposition of the motion, this court then accepted the government's version of the facts as true. Thereafter,

in an order dated February 10, defendant's motion was granted.

On February 23, 1972, the government moved for reconsideration of the above order or, in the alternative, for leave to present additional facts in the form of live testimony. Accompanying the government's motion and a memorandum of law was an affidavit of Agent Quintal, describing in detail the facts surrounding the search and, according to the Ass't. U. S. Attorney's own affidavit, reflects what Quintal would have said if he had been permitted to testify at the February 4th hearing. Because the facts alleged in Agent Quintal's affidavit added nothing new to the court's original assessment of the facts surrounding the search, therefore making live testimony futile, this court denied the government's motion, without argument.

### FACTS

Even though not filed on February 4, this court accepts as true all the following allegations in Agent Quintal's affidavit for purposes of this written decision on defendant's motion to suppress:

"On November 17, 1971, an informant who, on one occasion in the past had given me information which led to an arrest, telephoned me at my office, —that he had just spoken—Dennis Lee;—that Lee wanted to sell 26 pounds of marihuana at $270 per pound, and that he had been given a sample of this marihuana. I told the informant to bring the sample to the office.

"At approximately 1:15 p. m. on the same date, the informant came to my office and turned over to me a small bag containing marihuana. The informant then call[ed] Lee to make the arrangements for the sale of the rest of the marihuana. After the informant made the call, I, with the informant's consent, listened to the conversation on an extension. During that conversation the informant was told by the other party that there were 18 pounds of marihuana remaining and that the informant and his 'money man' should go to the Pupukea area [outside the Honolulu city limits].

"At approximately 3:50 P.M. on November 17, 1971, I, Agent Donald Monier and the informant drove to Pupukea Road and Kamehameha Highway where we met co-defendant, Dennis Lee, another male and a girl sitting in a Volkswagen car. I was introduced by the informant to Lee, and I asked Lee if the 18 pounds of marihuana were the same as the sample which he had given the informant. Lee responded that it was the same, and I then showed Lee $5,000 in funds. I then agreed with Lee that he would first show the informant the 18 pounds of marihuana, after which I would give the informant the money and the informant would buy the marihuana. During my conversation with Lee, I recognized this voice as the same voice I had overheard and spoken with earlier on the telephone.

"At approximately 4:00 P.M. . . . the informant and Lee drove off in the Volkswagen, leaving the above-mentioned female and male behind at a store on the same corner where I and Agent Monier awaited the return of Lee and the informant. Approximately 10 minutes later Lee and the informant returned accompanied by co-defendant Andrew Melamed. The informant had previously stated that Lee had mentioned the name 'Andy' as the source of supply. The informant immediately came over to my car and stated that while they had one pound of marihuana in the car, he had not yet seen the rest of the supply, but that he was being taken to the Chun's Reef area to see the marihuana. The informant instructed myself and Agent Monier to remain there and he would return in approximately 20 minutes.

"Because of what we considered to be a surveillance of ourselves being conducted by friends of Lee and Melamed in the store nearby, we decided

to proceed along Kamehameha Highway toward the Chun's Reef area. At approximately 4:25 P.M., I observed the informant, Lee and Melamed approaching us on Kamahameha Highway in the same Volkswagen. After we flagged them down, I told the informant outside the presence of Lee and Melamed to go to a nearby parking lot where Agent Monier and I placed Lee and Melamed under arrest. At the same time, we observed one pound of marihuana in the rear seat of the Volkswagen. This arrest took place at 4:30 P.M. at Waimea Beach Park, approximately 40 miles from Honolulu.

"Immediately after the arrest, the informant told me that he had seen the remaining 17 pounds of marihuana in a house at Chun's Reef. He stated that the marihuana was in two footlockers in a small bedroom, the location of which he described to me. The informant also described the source of this supply as being a white male with a full beard, whom he had just seen at this house at Chun's Reef. The informant then led us to this house, which is located at 61–353 Kamehameha Highway [about two miles away].

"After arriving at this location, we [Quintal and Monier] approached the front door where Agent Monier announced our purpose and authority and we entered. Upon entering the house we observed defendant Nolan Brewer, a white male with a full beard, and a female. Both were immediately placed under arrest. Approximately fifteen feet from where Brewer was standing when he was arrested, in a small bedroom, I observed two footlockers which were in plain sight. I went to this room, opened the footlockers, and found 17 pounds of marihuana. This arrest and seizure took place at approximately 4:45 P.M. on November 17, 1971." (Information within the brackets added by the court.)

## ANALYSIS

■ At the hearing on February 4, the government sought to justify this warrantless search on the basis of the "exigent circumstances" exception to the warrant requirement. It argued that because of the late hour (4:45 P.M.) and the time necessary to drive back to Honolulu to get a warrant (1 hour each way), a magistrate would not be available at his office.[1] Even if he or a federal judge could have then been found, the government contended that the consequential delay might have enabled Brewer to dispose of, i. e., destroy, the remaining 17 pounds of marihuana. The grounds for inferring this "threatened" destruction of evidence were: (1) Lee and Melamed in exercising their right to make a telephone call at the police station might take this opportunity to warn Brewer; (2) because Lee's friends had earlier observed the two agents at the original meeting place the agent's "cover" might have been exposed and the two observers therefore might have warned Brewer; (3) Brewer would immediately become suspicious when Lee, Melamed and the informer did not return to buy the other 17 pounds and would therefore destroy it.

■ As the Supreme Court said in Katz v. U. S., 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only *to a few specifically established and well-delineated exceptions.*" (Emphasis

1. Just because it was 4:45 P.M. does not mean that the magistrates or both federal judges would not be at their offices by the time the agents made the hour trip to Honolulu. Certainly, if this was a concern, one of the agents could have called and requested that one of these four delay their departure until the agents arrived. Even if none were at work, it is entirely unreasonable to assume that not one could be reached at his home on this Wednesday afternoon.

added.) Thus the universally accepted principle is that even though the authorities have probable cause to make the search, they must still first obtain a warrant, unless one of the exceptions apply, see e. g., Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) ; Chimel v. California, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and Agnello v. U. S., 269 U.S. 20, 32, 46 S.Ct. 4, 70 L.Ed. 145 (1925). It is also well recognized that the burden is on the government to show the existence of such a limited exception, see e. g., Vale, supra, at 34, 90 S.Ct. 1969 and Chimel, supra, at 762, 89 S.Ct. 2034.

The classical statement reflecting the reasons for the warrant requirement is contained in Johnson v. U. S., 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1947):

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

This concept was reaffirmed in Coolidge v. New Hampshire, 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The threatened-destruction exception on which the government here relies was explicitly limited in Vale, supra, at 35, 90 S.Ct. at 1972, to cases where "the goods ultimately seized were . . . in the process of destruction." The court cited three cases to support the exception, Schmerber v. California, 384 U. S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1961) ; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). In Schmerber, the only non-vehicle case where the Court has upheld the warrantless search solely on the basis that the evidence would otherwise be destroyed, the search (subjecting the defendant to a blood test) was approved because the "delay necessary to obtain a warrant, under the circumstances [the alcohol was actually disappearing from the blood], threatened 'the destruction of evidence' ", (at 770, 86 S.Ct. at 1835). In Jeffers, supra, at 52, 72 S.Ct. 93, the court referred to the "imminent" destruction of evidence. McDonald demands a similar showing.

We do not here have a vehicle case as in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), or Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1969), and thus the reasoning behind a warrantless search of vehicles is inapplicable here.

■ Whether after their arrest prisoners Melamed and Lee would be more concerned with Brewer than with their own plight is purely speculative; any identifiable basis for any such inference is lacking. Moreover, the government has shown no specific tie-in of Lee's two friends with either the marihuana sale or Brewer. Likewise the "belief" that Brewer would become suspicious at the absence of Lee and Melamed is a purely subjective conclusion—with no objective evidence to support it. More than just bare subjective belief of imminent destruction is necessary before such a warrantless search as here conducted can be legalized.

■ In view of the requirements that (1) this court strictly construe any exception upon which the government

seeks to uphold a warrantless search, and (2) the threatened destruction of evidence must at least be "imminent", plus (3) the special protection given to dwellings (as opposed to vehicles), this court finds that the bases for the government agent's belief that the marihuana was going to be destroyed are entirely too speculative to support the search, and do not approach the "imminence" that the law requires.

In its memorandum submitted with the February 23 motion, the government seeks to further justify the search as being incident to a valid arrest, citing as its authority *Chimel* and *Collidge, supra,* and United States v. Welsch, 446 F.2d 220 (10 Cir. 1971).

For the purposes of the hearing, this court assumed the validity of Brewer's arrest. This assumption was not unwarranted. While the informant's description of the source is general, i. e., "white male with a full beard," the informant did specify the house where the defendant was located. When the defendant opened the door, the agents were entitled to assume that he was the supplier; he not only fit the description, but the agents saw no other person even remotely resembling the defendant.[2] While this case does not have the specificity found in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the informant's reliability had been confirmed by both his past dealings with the Agents and the earlier arrests that very day of Melamed and Lee and the seizure of the pound of marihuana. Thus, although "the standards applicable to the factual basis supporting the officer's probable-cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment," Whiteley v. Warden, at 566, 91 S.Ct. at 1036, these standards are fulfilled here.[3]

Because the marihuana was seized in a room other than the one where Brewer was arrested, the government does not contend that the marihuana was within the "immediate control" of the defendant, as required by *Chimel, supra,* at 763, 89 S.Ct. 2034. Instead, the government argues that the seizure of the contraband should be allowed because it was in plain view of the Agents when they arrested the defendant, although the government admits it was "actually only in 'constructive sight.'"

The "plain view" exception to the warrant requirement received comprehensive treatment in *Coolidge, supra,* at 464–473, 91 S.Ct. 2037–2042:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure." 403 U.S. at 466, 91 S.Ct. at 2038.

The Court specifically held that the "plain view" doctrine is not in conflict with *Chimel.* Thus,

---

2. This might have been a very different case if the agents had seen more than one fully bearded white male at Brewer's home. As the Supreme Court said in Mallory v. United States, 354 U.S. 449, 456, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479:

"Presumably, whomever the police arrest they must arrest on 'probable cause.' It is not the function of the police to arrest, as it were, at large and to use an interrogating process at police headquarters in order to determine whom they should charge before a committing magistrate on 'probable cause.'"

This opinion does not consider the propriety of the arrest of "the female" who was also present at Brewer's home.

3. The absence of an arrest warrant under these circumstances is not crucial. See the opinions of Stewart, J., and White, J., in *Coolidge, supra,* at 480, 510–512, 91 S.Ct. 2022.

"Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee." 403 U.S. at 466, 91 S.Ct. at 2038.

In this case, the first and most obvious point is that here the *marihuana* was not in plain view. From the point where they arrested Brewer, the only things the Agents could see were the two footlockers. It was not until they entered the bedroom and opened the lockers that they saw the marihuana. Since it was not in "plain view," the government therefore argues "constructive sight", viz., because the footlockers were in plain view and the Agents were told that they contained marihuana, ergo the marihuana should be considered as if in fact it was in plain view.

The only case support for this "constructive sight" concept is U. S. v. Welsch, *supra*, where Welsch in his motel room had exhibited the open suitcase, full of narcotics, to two undercover agents, had then given Agent Ray samples therefrom, closed it up and put it under the bed. Agent Ray departed, ostensibly to test the samples and if found satisfactory to return and buy. The samples were field-tested, found to contain narcotics and Ray, with other officers, returned to the room within twenty minutes after he had seen the drug-filled suitcase shoved under the bed. When they were admitted they arrested him, and Ray reached under the bed and pulled out the "loaded" suitcase. In sustaining the legality of the search and seizure, the court said, "Under these facts, and considering the time interval, we must regard the suitcase as if it had been in 'plain sight' at the time of the defendant's arrest." 446 F.2d at 222.

No such "time factor", let alone fact factor, supports the search and seizure here. The Agent's knowledge of the location of the marihuana is not based on firsthand observation, as in *Welsch,* but on information supplied by an informant. Also, in *Welsch,* the suitcase was within the ambit of *Chimel,* which is not the case here. As Justice Stewart said in *Coolidge, supra,* 403 U.S. at 471, 91 S.Ct. at 2040:

"The initial intrusion may, of course, be legitimated not by a warrant but by one of the exceptions to the warrant requirement, such as hot pursuit or search incident to lawful arrest. But to extend the scope of such an intrusion to the seizure of objects—not contraband nor stolen nor dangerous in themselves—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure."

The "constructive right" doctrine, if it exists, nevertheless in the light of *Coolidge* must be most narrowly construed.[4] Unfortunately for the government that doctrine is not wide enough to legalize the seizure of marihuana here.

▬ Nor can the government justify the seizure of the marihuana on the basis of having a right to seize and search the footlockers. The government simply did not have such a right, see Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782. The footlockers,

---

4. The real danger in supplementing the "plain sight" exception with the government's "constructive sight" approach is that it can prove too much. If the informant in this case had told the agents that the marihuana was in a desk in the bedroom, or a closet in the bedroom, or just in the bedroom itself, and the agents could see each of these three things from the point where they arrested Brewer, then a seizure and search of the desk, closet or room would seemingly be permissible and the seizure of any evidence thereby found would have to be approved. Thus, the "plain view" and *Chimel* exceptions would be expanded beyond apparent limits.

per se, in no way could aid in either apprehension or conviction of Brewer.

The government has generally argued that because this search was specifically limited to the footlockers and therefore did not entail the extensive invasion of a "general search," there was no need for a warrant. While the Supreme Court has decided that a limited search in certain circumstances can be justified on less than probable cause, see *e. g.*, Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it has never determined that because a search is limited there is no need to obtain a warrant. In fact, the Court has insisted that while a limited search may be justified on less than probable cause, this less-demanding standard must still be implemented by a neutral magistrate, unless one of the well-established exceptions apply, see *e. g., Camara, supra.*

### CONCLUSION

As this court has often said of search and seizure problems, there is only one rule of law that is always applicable thereto: the ultimate decision rests *entirely* on the particularized facts of the particular case at the particular time of the motion. In weighing the impact of given facts on the defendant's constitutional rights, regardless of the time, the court is always faced with the fundamental requirement that a warrant, subject to various limited exceptions, must be issued by a neutral magistrate before a search can be conducted. As the Court stated in McDonald v. United States, *supra,* 335 U.S. at 455–456, 69 S.Ct. at 193:

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too previous to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

The government has not adequately justified the lack of a search warrant in this case.

This court is cognizant of the many problems that confront most law enforcement personnel in the performance of their duties. It is also aware that the lack of predictability in the law of search and seizure may frequently compound these difficulties. While the good faith of the agents involved in this case is not questioned and "it would be nonsense to pretend that [the] decision today reduces Fourth Amendment law to complete order and harmony," *Coolidge, supra,* 403 U.S. at 483, 91 S.Ct. at 2047, this decision does stand for one easily applied and understood principle, i. e., exceptions to the search warrant requirement must be strictly construed. The guarantees of the Fourth Amendment demand this much.