**UNITED STATES of America**

v.

**Paul Gary RUBIN et al.**

v.

**Louis Martin AGNES a/k/a Louis Martin.**

**Crim. Nos. 71–555, 71–620.**

United States District Court,
E. D. Pennsylvania.

May 31, 1972.

Jeffrey M. Miller, Asst. U. S. Atty., Philadelphia, Pa., for plaintiffs.

Jonathan V. Miller, Joseph C. Santaguida, Robert F. Simone, Philadelphia, Pa., for defendant.

## OPINION

### I

### INTRODUCTION

HIGGINBOTHAM, District Judge.

The instant case presents a classic dilemma of balancing a citizen's right from unreasonable searches and seizures against a law enforcement officer's fervent intent to apprehend those persons actually dealing in substantial quantities of hashish. For here, literally, the defendants were "caught with the goods" —90 pounds of hashish. The issue is raised by a motion to suppress the seizure of the aforementioned "hashish" which was found at defendant Agnes' home where the other codefendants were in the process of packaging it. As noted below, the ultimate issue is whether this search falls within one of the recognized exceptions which precludes the necessity of obtaining a search warrant. It is indeed a close case.

At approximately 6:20 p. m., on the date in question, the officer in charge had to make an instant decision as to (1) whether he would risk losing the evidence while waiting for the preparation and procurement of a search and seizure warrant, or (2) whether he would attempt to seize the evidence and thereafter risk losing that which was seized, by way of a motion to suppress. I cannot be critical of the judgment exercised; I believe that under the exigencies of the hour many fair-minded law enforcement officers would have chosen the same option. However, my role is quite remote from the dilemmas facing the officer who must make a split-second decision. For I have had several weeks to review the most careful distinctions articulated in Supreme Court decisions, thoughtful Law Review articles, and the extensive arguments of counsel. After this lengthy review, I have concluded that in this extremely close case the motion to suppress should be granted— particularly in view of the Supreme Court's opinions in Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); and Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). But for the aforementioned Supreme Court opinions I would have concluded that the instant search and seizure (without a warrant) was permissible under the so-called "emergency doctrine".

## II

## BACKGROUND

On September 30, 1971, the above named defendants were indicted for conspiracy and possession of a controlled substance with intent to distribute,[1] that is, ninety (90) pounds of "hashish", all in violation of Title 21, United States Code, Section 841(a) (1).

Sometime during the month of July, 1971, federal customs agents received reliable information that a bronze statue containing a large shipment of illicit drugs, from a point somewhere in Europe, would be shipped to a hospital in this area. (N.T. 7–8). As a result of this information, agents or "look-outs" were posted at the Philadelphia International Airport and the waterfront. On or about July 26, 1971, a crate, answering the general description given to the agents by the informant, was delivered to the Airport. (N.T. 9). Thereafter, Federal customs agents inspected the crate and statue; they then removed a small sample of the contents for chemical analysis. This sample was confirmed to be "hashish", a controlled substance under Title 21, United States Code, Section 841(a) (1). (N.T. 12–13). The statue contained approximately ninety (90) pounds of "hashish"; it was addressed to Dr. Daniel Sill of the Board Street Hospital (N.T. 10); Dr. Sill is not a co-defendant to this action. Thereafter, the crate was resealed and placed under constant surveillance. Subsequently, and as expected, a pick-up was made on July 28, 1971, at approximately 4:00 p. m., by two men, one of whom was identified as Louis Martin Agnes (A/K/A Louis Martin), a defendant herein. (N.T. 13). The crate was taken from the Airport by defendant Louis Agnes, by car, to 1819 S. 9th Street in Philadelphia, where it was unloaded at about 5:00 P.M.[2] (N. T. 40–41). Shortly thereafter, a custom's agent was dispatched at approximately 5:10 P.M. on July 28, 1971, to prepare and procure a search warrant. (N.T. 106). Subsequently, defendant Agnes left the South Ninth Street address at about 6:00 P.M., without the crate, but in his car. He was, of course, placed under surveillance. During this surveillance, Agent Bergin testified that "it appeared to us that the vehicle [Agnes' car] was becoming evasive and aware we were behind it, and we stopped it and took the operator in custody." (N.T. 63). The actual arrest occurred at a gasoline station (some six blocks from Agnes' home), between 6:20 and 6:30 p. m. (N.T. 43, 85). As he was being taken into custody, Agnes yelled to the gas station attendants and spectators, "Call my brother". (N.T. 66, 67, 86). The agents testified that at this point they reasonably believed that there existed the "threat of destruction" to the "hashish", which had been delivered to defendant Agnes' home. (N.T. 67–69). Thus, the agents proceeded to enter defendant's home in order to preserve the evidence contained therein. Once inside, the officers found the co-defendants, Earl Melvin Agran, Paul Gary Rubin, and Jan Massaar, in the process of packing the "hashish" for possible distribution; all were arrested and the "hashish" seized. (N.T. 71–73). Of course, the search was made without a warrant, and subsequent to the arrest of defendant Agnes. Upon the arrest of Agnes, Agent Moss abandoned his efforts to procure a search warrant. (N.T. 105–108).

Defendants have all filed motions to suppress, contending that the search and

---

1. In Criminal indictment No. 71–555 all defendants are charged with conspiracy and possession; No 71–620, is a single count indictment charging Louis Martin Agnes with the illegal importation of a controlled substance with intent to distribute.

2. It should be noted at this juncture that the agents involved had prior to the pick-up of the statue identified Louis Martin Agnes as a possible suspect and had placed the house under complete surveillance on the date in question, at approximately 10:30 A.M., some 5 hours before the statue arrived at the South Ninth Street address. (N.T. 24, 25, 38).

seizure without a warrant, under the circumstances of this case, was unreasonable and in violation of their rights secured by the Fourth Amendment.

The government argues, on the other hand, that there was probable cause to arrest defendant Agnes when they did, and the subsequent warrantless search of his home was justified under the so-called "emergency doctrine", to prevent the destruction of incriminating evidence.

## III

### PRELIMINARY RULINGS

Before discussing, at length, the major contentions of the government and the defendants, as to the "reasonableness" of the instant search, I must rule on some subsidiary contentions raised by both parties. These issues must be preliminarily disposed of before adjudicating the validity of the search.

First, it is clear that all defendants were on the premises either at the request or acquiescence of the defendant Agnes; thus, each has standing to suppress any illegally obtained evidence that may be used against them. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. West, 453 F.2d 1351 (3d Cir. 1972). See Note, Standing to Object to an Unreasonable Search and Seizure, 34 U.Chi.L.Rev. 342 (1967).

Secondly, since the arrest of Agnes was at least six blocks away from the place of actual seizure of the hashish, it is apparent that in terms of time and place the subsequent search of Agnes' home could not be justified on the rationale of a search incident to an arrest. This search lacked that element of being "substantially contemporaneous" with the arrest of Agnes. Agnello v. U. S., 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

At the time of the search, Agnes' home apparently was not being lived in though some painters and craftsmen were present for the purpose of remodeling it. The government argues that since the "house" was not a "home" in the usual sense, this Court should "grant greater latitude to the instant search than would be afforded a home." This argument is patently without merit, and as such is untenable. The test of *any* search, *anywhere, any* time, is the Fourth Amendment. This Constitutional mandate is premised, not upon the general character of the place searched, but whether or not the individuals had a reasonable expectation of privacy. The Supreme Court stated in Katz v. United States, 389 U.S. 347, 351, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967):

> "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. (Citations omitted). *But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.*" (emphasis added).

Thus, it is clear the house, home, or residence, used by defendants to carry on their illegal activity is protected from an "unreasonable search and seizure", and that the premises in question, though not occupied as a dwelling, has the same Fourth Amendment safeguards as a fully occupied home.

## IV

### WARRANTLESS SEARCHES

The crucial issue in this case is whether or not the warrantless search of defendant's home, under the facts and circumstances of this case, and the consequent seizure of the hashish are constitutionally permissible under the Fourth Amendment of the Constitution.

A. Purpose of the Fourth Amendment

It is well settled law that the Fourth Amendment generally prohibits a law enforcement officer from entering

a private home to search and seize a "thing" therein without first procuring a valid search warrant.[3]

The purpose of the Fourth Amendment was most recently reaffirmed by the Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 449, 91 S.Ct. 2022, 2029 (1971).

> "The point of the *Fourth Amendment,* which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. *Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.* Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. \* \* \* *When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."* (Emphasis added)

Forty-six years earlier in Agnello v. United States, 269 U.S. 20, 32, 33, 46 S.Ct. 4, 6 (1925), the Court stated:

> "While the question has never been directly decided by this court, it has always been assumed that *one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein.* Boyd v. United States, 116 U.S. 616, 624, et seq., 630, 6 S.Ct. 524, 29 L.Ed. 746. (Citation omitted) (Dictum)
>
> \* \* \* \* \* \*
>
> *"Belief, however well founded,* that an article sought is concealed in a dwelling house, *furnishes no justification for a search of that place without a warrant.* And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."* (Holding) (Emphasis Added)

This dictum and holding of Agnello was recently reaffirmed by the Court in Coolidge v. New Hampshire, *supra.* Moreover the Court in *Coolidge* held, inter alia, that:

> " . . . the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, *are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' "* (emphasis added)

Thus, it would appear that a warrantless search of defendant's home can only be sustained if it was justified by one of the judicially established exceptions to the warrant requirement.

## B. Exceptions to the Warrant Requirement

All warrantless searches are not prohibited by the Fourth Amendment, however, the general rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to *a few specifically established and well-delineated exceptions."* Katz v. United

---

3. The Amendment reads: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

The Supreme Court in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), held that the Fourth Amendment's guarantee against unreasonable search and seizure was applicable to the states by the Fourteenth Amendment's due process clause.

States, 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967); Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969 (1970). The burden rests upon the government to show the existence of such an exceptional situation. Chimel v. California, 395 U.S. 752, 762, 89 S.Ct. 2034 (1969). The Supreme Court recently listed all the exceptions to the warrant requirement in Vale v. Louisiana, *supra*. The many exceptions listed in *Vale* can be categorized into five general exceptions.[4] First, a warrantless search can be justified if the arrestee consents. Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); Secondly, if the law enforcement officers are in "hot" pursuit of a fleeing "felon" a warrant is not required. Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); thirdly, if the evidence is about to be removed from the jurisdiction a warrant is not required. Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); Further, a warrant may *not* be required where the evidence ultimately seized is in the process of destruction. Schmerber v. California, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908, (1966). Finally, if the officers are responding to an emergency, a warrant is not required. See, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). It should be noted that the Court in *Vale, supra*, listed the last two cases under the "emergency exception" and also under the *Schmerber* exception, that is, the goods are in the "process of destruction". From the facts and circumstances of our case it is obvious that the only exception applicable to this case, if any, is the emergency exception.

### C. The Exceptional Circumstances Doctrine

The so-called emergency doctrine was first referred to by the Supreme Court in United States v. Johnson, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Federal law enforcement officers acting on reliable information were informed that someone was smoking opium in a certain hotel room. The Federal officers, accompanied by local police officers proceeded to investigate; upon approaching the said room they detected a strong odor of burning opium. Thereafter, the officers knocked on the door, which was opened by defendant and, after entering the room immediately conducted a search which resulted in the seizure of opium. The government attempted to justify the search on the grounds that the search and arrest were contemporaneous events, and on the grounds of consent. The Supreme Court rejected both contentions and consequently the opium was suppressed. The Court ruled that there were no exceptional circumstances to justify the search in question. Moreover, the Court categorically stated that reasons of inconvenience and delay caused by procuring a warrant where there is probable cause to arrest are:

> " . . . *never* very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. *No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear.*" Johnson, *supra*, page 15, 68 S.Ct. page 369 (emphasis added)

Nearly one year later in McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191 (1948), the Court once again reversed a conviction grounded upon a warrantless search of a home. In *McDonald, supra,* law enforcement officers had entered defendant's boarding house room, where defendant was actively engaged in the tabulation of the day's receipts from an illegal lottery. Defendant was arrested in his room and the police seized

---

4. Note, Police Practices and the Threatened Destruction of Tangible Evidence, 84 Har.L.Rev. 1465, 1467, note 9, (1971).

incriminating evidence in the room. The Supreme Court stated, *inter alia,*

> "Where, as here, officers are not responding to an emergency, there must be *compelling reasons* to justify the absence of a search warrant." pages 453, 454, 69 S.Ct. page 193 (emphasis added)

Once more, the Court rejected the argument that for reasons of inconvenience and delay a warrant had not been procured. Moreover, it reaffirmed its position in *Johnson, supra,* that the only *compelling reasons* would excuse law enforcement officers from the warrant requirement.

Three years later, in United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93 (1951), police officers had searched defendant's room without a search warrant. The officers obtained a key from Mrs. Jeffers to a room shared jointly by her and defendant. Defendant was not home at the time of the search; he later confessed when confronted with the seized narcotics. The Court in reversing defendant's conviction cited the following language:

> " . . . nor were *exceptional circumstances present to justify the action of the officers.* There was no question of *violence,* no *movable vehicle* was involved, *nor was there an arrest or imminent destruction, removal, or concealment of the property intended to be seized.* In fact, the officers admit they could have easily prevented any such destruction or removal by merely guarding the door . . . " page 52, 72 S.Ct. page 95 (emphasis added)

This language, it should be noted, is nearly identical to that used in *McDonald, supra.*[5] The Court went on to state that if an exception will lie "the burden is on those seeking the exception to show the need for it."[6] It is clear from a reading of *Johnson, McDonald,* and *Jef-*

*fers,* that the Court has not established a clear and definitive standard which would justify a warrantless search; however, these three cases implicitly hold on their facts that the "emergency circumstances" exception can not be invoked unless it is clear that the purpose of the search will be frustrated.

The exceptional circumstance doctrine and the appropriate standard was most recently discussed by the Supreme Court in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034 (1969). *In Chimel,* the Court is analyzing the problem of a search incident to a lawful arrest. The defendant here was arrested in his home and in the presence of his wife. The police, feeling some concern that defendant's wife might destroy any incriminating evidence (secreted in their home) if they left to procure a search warrant, searched defendant's home without resort to the warrant process. The Supreme Court was faced with the vexing problem of the proper scope of a search incident to a lawful arrest in one's home. In overruling United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), the Supreme Court held that the Fourth Amendment requires, *inter alia,* that a warrantless search be *compelled by necessity* in order to meet the Fourth Amendment's standard of reasonableness. Thus, the Court further held that a warrantless search incident to a lawful arrest must be limited to the person of the arrestee, *and the immediate area within his reach.* The Court also stated: "We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."[7] The Court went on to quote from the dissenting opinion of Mr. Justice Frankfurter:

> "To say that the search must be reasonable is to require some criterion of

---

5. McDonald v. United States, *supra,* page 455, 69 S.Ct. 191.

6. United States v. Jeffers, *supra,* page 51, 72 S.Ct. page 95.

7. Chimel v. California, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, quoting McDonald v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191 (1948).

reason. It is no guide at all either for a jury or for district judges or the police to say that an "unreasonable search" is forbidden—that the search must be reasonable. *What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment:* the history and experience which it embodies and the safeguards afforded by it against the evils to which it was a response." United 70 S.Ct., at 443 (dissenting opinion). (*Chimel,* supra, 395 U.S. page 765, States v. Rabinowitz, 339 U.S., at 83, 89 S.Ct. page 2041) (emphasis added)

In overruling *Rabinowitz,* the Court in *Chimel* specifically noted and rejected the government's contention that it was reasonable to search a man's house, under the circumstances, if he were arrested therein. The Supreme Court noted that one result of this rationale and the *Rabinowitz* test of reasonableness would be the evaporation of the protection afforded by the Fourth Amendment.[8]

Thus, it is abundantly clear that *Chimel* was a direct and severe restraint, not only on the permissible scope of a search incident to a lawful arrest, but it is also on its facts an indication of the high degree of necessity required to justify a warrantless search, even when the arrestee is arrested *in* his home.

Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969 (1970), is a perfect illustration of the high degree of necessity required by the Court in sanctioning a warrantless search. In *Vale, supra,* the defendant was arrested on his front steps, pursuant to a valid arrest warrant. The police officers had witnessed an apparent narcotics sale by defendant from an area directly in front of his home.

A few minutes after his arrest, defendant's mother and brother returned home from a shopping trip. The police officers, fearing that defendant's mother or brother might remove or destroy any heroin concealed by defendant in the house, immediately conducted a search of defendant's home. As a result of the search, the officers discovered and seized a quantity of heroin from defendant's rear bedroom. The State Supreme Court upheld the search and seizure as incident to a valid arrest. The Supreme Court reversed, noting specifically that *no* exceptional circumstances existed:

"The officers were able to procure two warrants for Vale's arrest. They also had information that he was residing at the address where they found him. There is thus no reason, so far as anything before us appears, to suppose that *it was impracticable for them to obtain a search warrant as well.*"

\*    \*    \*    \*    \*    \*

"We decline to hold that an *arrest on the street can provide its own "exigent circumstances" so as to justify a warrantless search of the arrestee's house.*" 399 U.S. page 34, 90 S.Ct. page 1972 (emphasis added)

Further, the Court stated that no emergency existed and the narcotics were not actually "in the process of destruction."[9] Thus, the Court concluded there was no reason why a warrant could not have been obtained. *Vale* and *Chimel* when read together on their facts are probably stronger cases than the instant case in terms of an "imminent threat of destruction." Moreover, the arrest and search in both cases are more contemporaneous in time and space than the instant case.

---

8. Chimel v. California, *supra,* 395 U.S. page 765, Note 10, 89 S.Ct. page 2041: "Some courts have carried the Rabinowitz approach to just such lengths. See, e. g., Clifton v. United States, 224 F.2d 329 (C.A.4th Cir.) cert. denied, 350 U.S. 894, 76 S.Ct. 152, 100 L.Ed. 786 (purchaser of illicit whiskey arrested in back yard of seller; search of one room of house sustained) ; United States v. Jack-son, 149 F.Supp. 937 (D.C.D.C.), rev'd on other grounds, 102 U.S.App.D.C. 109, 250 F.2d 772 (suspect arrested half a block from his rented room; search of room upheld)."

9. Vale v. Louisiana, *supra,* page 35, 90 S.Ct. 1969; *cf.* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826 (1966), to be discussed *infra.*

At this juncture, it is interesting to note and relevant to our decision in this case that the Supreme Court has sustained a warrantless search of a person or property in only three distinct instances, and in each instance the Court stressed the imperative need for the search.[10]

## V

## PERMISSIBLE WARRANTLESS SEARCHES

In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court upheld the right, under suspicious circumstances (but less than probable cause), to "stop and frisk" a suspect. The rationale and holding of *Terry,* was that a police officer has an inherent right to make a protective search for the safety of himself and others.

The second exception to the warrant requirement is Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642 (1967). *Warden,* involved the so-called "hot pursuit" doctrine. The operative facts of *Warden,* supra, follow:

An armed robber entered the business premises of the Diamond Cab Company in Baltimore, Maryland; the robber took over three hundred dollars and ran. Two cab drivers, attracted by shouts of "HOLD UP", followed the man to a certain house. The other driver notified the company, gave a description of the robber and the address of the house the robber had entered. Within minutes police had the house surrounded. The officers knocked and announced themselves; they were admitted by the suspect's mother. The officers searched the entire house. Defendant was arrested; the officers found weapons and clothing belonging to the defendant which matched the description given to them. The Supreme Court held "that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid.

Under the circumstances of this case, "the exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193 (1948). In essence *Warden* is really another case, not unlike Terry v. Ohio, of the Supreme Court upholding the right of police officers to make a protective search. The Court noted in this regard:

> "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would *gravely endanger their lives or the lives of others."* (387 U.S. pages 298–299, 87 S.Ct. page 1646). (emphasis added)

The third case is Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826 (1966); defendant was given a blood test to determine the alcoholic content of his blood, against the arrestee's will. In facing the question of a warrantless search which penetrated the body, the Court noted that the officers were faced with an emergency; and if they delayed the search to obtain a search warrant, the body would have assimilated the alcohol, thereby frustrating the purpose of the search.

Thus, in all cases where a warrantless search of a person or his property has been upheld, the Supreme Court has done so on the theory of either a protective search, or, as in *Schmerber,* the evidence is in the actual process of destruction. Thus, these three exceptions, and the operative facts of the *Chimel* and *Vale* cases in my mind conclusively preclude the sanctioning of the warrantless search made in the instant case. This conclusion is supported by the recent Supreme Court decision in Coolidge v. New Hampshire, 403 U.S. 443, 484, 91 S.Ct. 2022, 2047 (1971). There the Court stated:

> "We are convinced that the result reached in this case is correct, and that the *principle it reflects*—that the police *must* obtain a warrant when

10. Note, The Neglected Fourth Amendment Problems in Arrest Entries, 23 Stan.L.Rev. 995, 1004–1005 (1971).

they intend to seize *an object outside the scope of a valid search incident to arrest*—can be easily understood and applied by courts and law enforcement officers alike. *It is a principle that should work to protect the citizen without overburdening the police, and a principle that preserves and protects the guarantees of the Fourth Amendment.*" (emphasis added)

Moreover, the operative facts of *Vale, Chimel,* and *Schmerber,* implicitly hold on their facts that under the "exigent circumstances" doctrine a warrant is *not* required, if, and only if, the evidence is in the actual "process of destruction." [11]

■ When Agnes said, "Call my brother", it is understandable why a law enforcement officer might assume that a message could have been sent to the South Ninth Street address notifying Agnes' co-defendants therein or other persons that Agnes had been arrested. Upon receipt of such a message, and in their own self interests, the persons at the South Ninth Street address would have been inclined to destroy or remove the evidence. Thus, at the moment Agnes shouted, "Call my brother", the officer in charge had to make a most difficult decision. A warrant had not been obtained, and it may have taken additional hours to prepare it, present it to a magistrate, have it approved, and to execute the warrant. In this time period, the hashish could have been destroyed or removed. Since defendants Paul Rubin, Jan Massaar, and Melvin Agran were caught packaging the hashish, defendants emphasized that when the search took place the evidence *had not* been destroyed and that it would have taken some time thereafter before it could have been destroyed. A law enforcement officer has no crystal ball to predict which option defendants would utilize; he is not omniscient. To me it was at least a reasonable assumption that a message would be delivered, and if so efforts would be made to promptly destroy or remove the hashish. Defendants further assert that since the house had been under surveillance the officers should have gotten a warrant that morning. Perhaps the Supreme Court cases would require them to have obtained a warrant that morning; however, in fairness to the law enforcement process the problem must be put into a rational perspective different than that obtained by Monday morning quarter backing. The reality and options with which the agents had to deal were varied and many. First, the officers believed that the statue would be picked up from the airport and thus they kept it under constant surveillance for days. Secondly, they could not be certain as to where the statue was going to be delivered. Philadelphia is a city of more than two million people with thousands of homes and buildings. Someone dealing with such hot cargo could have dropped it off at an infinite number of places in this city and region.[11a] Thus, as a practical matter, it is highly improbable to predict with certainty the place where the hashish would have been dropped. Under the facts of this case, when Agnes was merely transporting the statue from the Airport to a place then unknown, there would have been an arguable defense that he was merely an innocent chauffeur. Thus there were sound reasons for not making an arrest until the hashish had reached a more permanent destination and until someone had had time to open the statue. Thus, as I read the cases, the alternatives which the law enforcement officers had were (1) obtain the warrant for the South Ninth Street address on the hunch that it would have been delivered there, or (2) not to obtain a warrant, but keep the house under surveillance after the hashish had been delivered, then attempt to obtain a warrant and execute it, hopefully, before the goods were destroyed or removed, or (3) if prior to obtaining

11. But see, Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The contents of defendant's stomach were forcibly extracted against his will; the evidence was suppressed.

11a. See, note 2, *supra,* at page 627.

the warrant anyone was found leaving the premises they could stop them in an effort to ascertain whether they had any of the hashish on their person, and (4) if they did the latter (3), they would increase the possibility of a message going back to the house where someone inside could make an effort to destroy the hashish prior to the procurement of a valid search warrant. Moreover, if they stopped the person on the street and even if they found some hashish on their person, they would be subject to challenge of whether or not probable cause existed for the arrest and seizure.

Probably the only constitutional alternative was (1), *supra*. This means that warrants must be sought whenever the officers have a hunch that drugs or illegal contraband might be delivered to a specific address.

I have taken time out to analyze these alternatives because they indicate the complexity and probable frustration which must exist in cases of this type even among law enforcement officers who want to be fair. Of course, Monday morning quarter backing, as offered so glibly by counsel for the defendants, suggests several other game plans which should have been used; but the officer in charge on the scene is not permitted to be a Monday morning quarter back. He had to make the decision under the excruciating pressure of tight time demands and the cases hold that here he called the wrong play. Thus, it is my conclusion that Vale v. Louisiana, supra, is controlling and dispositive of this

case.[12] because of the high degree of exigency required by Vale. It has been noted that:

"Measured by these standards, the *Vale* court's conclusion was correct— warrantless searches of a home should not be allowed every time evidence is merely *"threatened with destruction."* The *'threatened destruction'* situation is neither well defined nor limited to situations where the officer is likely to have probable cause to search. Officers may rationally perceive possibilities of destruction whenever they think evidence is on the premises. Mr. Justice White, dissenting in *Chimel*, commented that *'there must almost always be a strong possibility that confederates of the arrested man will . . . remove the items for which the police have probable cause to search'*. Thus, a threatened-destruction exception might well reduce in practice simply to the requirement that police officers believe they have probable cause to search. The risk of searches without probable cause would then be about the same as if there were no warrant requirement." (emphasis added).[13]

Therefore, in light of all the foregoing, as to the evidence which was actually seized at 1819 South 9th Street, the defendants' motions for suppression are hereby granted.

No motion to suppress is granted as to anything which was found on defendant Agnes' person at the time of his arrest.[14]

---

12. The Government urges this Court to adopt the holding of United States v. Pino, 431 F.2d 1043 (2d Cir. 1970). The facts of Pino make it a close case under Chimel v. California. But Pino is not controlling or persuasive under the facts and circumstances of our case, nor does it withstand the "high degree of exigency" required under the facts of Vale v. Louisiana, *supra*.

13. Note, 84 Harv.L.Rev. 1465, 1473 (1971), *supra*, Note 3.

14. I do this, of course, realizing that the evidence herein suppressed is of the utmost materiality to the government's case, and that they have the right to appeal this decision pursuant to 18 U.S.C. § 3731 (1971).