**Terry Don BLACKBURN, Cheri Faye Pope and Ricki Blackburn, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**Jack Bobby PAYNE, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**Nos. F–76–691 and F–76–692.**

Court of Criminal Appeals of Oklahoma.

Feb. 17, 1978.

Rehearing Denied March 13, 1978.

Myers, Mollison & Weber, Altus, for appellants Blackburn, Pope and Blackburn.

Mark T. Coke, Harbison & Coke, Altus, for appellant Payne.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Jerry Earl Benson, Legal Intern, for appellee.

## OPINION

BRETT, Judge:

The appellants, Terry Don Blackburn, Cheri Faye Pope, Ricki Blackburn, and Jack Bobby Payne, hereinafter referred to as defendants, were charged in the District Court, Jackson County, Case No. CRF–75–146, with the offense of Possession of Marihuana With Intent to Distribute, in violation of 63 O.S.Supp.1975, § 2–401. They were convicted in a jury trial, and were each sentenced to five (5) years imprisonment, but with partial suspension: Terry Don Blackburn and Jack Bobby Payne were given four (4) years suspension and Cheri Faye Pope and Ricki Blackburn were given four and one-half (4½) years suspension on their respective sentences. From said judgments and sentences the defendants have appealed to this Court; and for the sake of convenience and economy this Court has on its own motion consolidated the separate appeals brought by the defendants below.

Mrs. Eunice Gresham, neighbor and landlady to the defendants, described the layout of the property, and related that the defendants had moved into her rent house about five (5) months prior to their arrest.

The rent house was next door to the house in which Mrs. Gresham lived, and although each house had its own front and back yard, there was a common drive which both shared.

The driveway ended in a garage to which the defendants were not given access. Behind the garage was a parcel of land which Mrs. Gresham had traditionally used for a garden; and although it was not part of the original rental agreement, she told the defendants that they could use the plot for a garden of their own. The defendants did plant a garden, but Mrs. Gresham said that after the vegetables came up, the weeds came up and finally got so high that she could hardly see the corn for the weeds.

One of the things that concerned Mrs. Gresham about her new tenants was a constant traffic of visitors. She thought it strange that a carload of people would pull up to the house, but not everyone would get out of the car. One or two persons would go in the house for five or ten minutes; then they would come out and get in the car, and all would leave. Another matter that she found strange was that her tenants took most of the screens off the windows. She went outside early one morning before the defendants had risen, and she saw the window screens lying in the yard. She picked them up and put them in the garage to keep them from getting torn up. Mrs. Gresham testified that one of the screens was sitting atop a box filled with dark-colored dried leaves. Defendant·Terry Blackburn told her that he grew and sold herbs.

On September 10, 1975, Mrs. Gresham saw a man come to the defendants' house in a pick-up, and he and the defendant Terry Blackburn unloaded something on a large sheet of black plastic. She later saw the plastic behind the garage: it was wrapped around something, and had rocks placed on it to hold it down. In the middle of the plastic was a hole with some sort of stalk sticking out. On September 15, 1975, Mrs. Gresham called the County Sheriff. She told him of the various strange things she had seen, and gave him permission to come out and look around.

With regard to the defendant Payne, Mrs. Gresham testified that he was not one of the original lessees, but that about two weeks prior to the arrest he began coming and going frequently, and that she believed him to be a resident of the house. On at least one occasion she saw him carrying clothes on clothes hangers into the house.

On cross-examination Mrs. Gresham told of seeing Joe Boaldin, the County Sheriff, come out on the morning of September 16. He parked next to the garage and walked behind it to inspect the garden plot.

Sheriff Boaldin testified that on September 15, 1975, he received a phone call from Mrs. Gresham; and then, over the defendant's objection he testified at length concerning what Mrs. Gresham had told him that day on the telephone. On the morning of September 16th he went to Mrs. Gresham's property with three deputies. While the deputies parked on the side of the road and waited, the Sheriff pulled in the drive and parked beside the garage. He said he walked around the garden to the other side, where he saw the large plastic-wrapped bundle about thirty feet from him. The plastic sheet had a hole in it, through which protruded a single plant stalk about six inches long.

Sheriff Boaldin said he recognized the stalk to be marihuana, so he radioed his deputies to come in and make the arrests of the defendants. He related the confusion that existed and stated that he advised one of his deputies to break open the door to the rent house, if the people inside did not open it. He related also that he did not seek to obtain a search warrant, but he did talk to the assistant district attorney who advised him that he did not need a search warrant if he found marihuana on the premises. He described how he and his deputies gathered up the contraband and loaded it on a pickup truck. He also testified on cross-examination, that he could not specifically identify the substance he found in the plastic bundle, because it was mixed in with all the other substances. The substance was taken into town and weighed at a local elevator and found to be one hundred and fifty

pounds. Sheriff Boaldin also identified the exhibits offered by the prosecution. Among the items of evidence were those taken from inside the rent house, i. e., rubber gloves and a set of scales.

On redirect-examination the State introduced the remainder of its exhibits—some 20 photographs of the house and yard, which the Sheriff identified.

Deputy Billy Larue related that he arrested defendant Payne, who had run from the house barefooted; and he called to the Sheriff to head him off. When Payne heard Deputy Larue call to Sheriff Boaldin, he stopped and offered no resistance to the arrest. Larue also testified that Deputy Chuck Paris was at the front door with defendant Cheri Pope Blackburn when Larue sought defendant Payne.

Deputy Chuck Paris related, when the radio call was received from Sheriff Boaldin, he went to the front door of the rent house, knocked and was confronted by Cheri Pope Blackburn; he identified himself and informed her that all the persons in the house were under arrest and for all of them to come out of the house. She asked him if he had a search warrant; and when he informed her he did not have a warrant, she closed the door. He knocked again and Terry Blackburn came to the door and advised the deputy that unless he had a search warrant to leave his house. Blackburn also closed the door to the deputy. Deputy Paris went to the back door and knocked again, without results. Deputy Paris then consulted with Sheriff Boaldin and informed him it would be necessary to use force to enter the house. Sheriff authorized him to use force if necessary. He went to the back door again and Terry Blackburn and Cheri Blackburn came out and he placed them under arrest. But the door was closed again and secured. He again asked the younger Blackburn boy to open the door, but he refused; so the deputy kicked the door three times and went into the house. When he was inside, he placed Ricki Blackburn under arrest. All of the defendants except Cheri Blackburn were transported to the Sheriff's Office. Cheri Blackburn remained at the house while he and Deputy Dan Pilcer searched the entire premises. During the search he related that he found certain substances he considered to be marihuana, a pair of rubber gloves and a set of small scales.

William J. Caveny, a forensic chemist for the Oklahoma State Bureau of Investigation, testified that he went to Sheriff Boaldin's office and took nine random samples of the confiscated substances. He conducted tests of the substances and determined them to be marihuana. He testified further, that he could not determine whether or not the substances were marihuana without conducting proper chemical tests on it. When the exhibits were introduced into evidence defense counsel objected to their admissibility, which objections were overruled. At the conclusion of this testimony, the prosecution rested its case.

The first witness called by the defense was R. L. Copeland. He testified that as a farm hand he had plowed the land around the two houses. The houses were set back from the road somewhat, and the land on all four sides was cultivated. He said that he noticed weeds all around the area, but that none had caught his eye as being out of the ordinary. Mr. Copeland was unable to identify any of the defendants as persons who lived in the house. He said that his only encounter with any of the tenants in the rent house had been when he was plowing; and that one person had come out and asked him not to plow the garden area.

The defense then called Danny Martin. Mr. Martin did Mrs. Gresham's yard work; and he testified that about one week before the day of the arrests, he had mowed the area around the rent house, and that no one had objected. He did not notice any unusual weeds.

However, on cross-examination the prosecution went through the pictures with the witness, and he admitted that some areas had not been mowed very well, as the weeds were waist high. Mr. Martin stated that he mowed the yard every two or three weeks all summer; but then said that it was possible that he had missed a time or two due to rainy weather and wet grass.

At this point, the defendant Payne took the stand. He told his version of the arrest, and testified that he had merely been spending the night with the other defendants. He denied living there, and denied having anything to do with marihuana.

The next witness for the defense was Earl Blackburn, father of two of the defendants, and father-in-law of the defendant Cheri Pope Blackburn. He said that he visited the defendants several times each week during the entire time they lived in Mrs. Gresham's house. Although he had come unannounced he never saw any marihuana, nor had any reason to think anything unusual was going on. However, on cross-examination he admitted that he had no knowledge of the circumstances of the day of the arrests, nor of what might have been out there that day.

After presenting character testimony the defense rested.

The first assignment of error raised by the defendants is a general proposition covering all of the evidence seized on the day of arrests, both before and after the arrests were actually made, on the ground that a search warrant should have been obtained.

■ Every search and seizure made without a search warrant is per se unreasonable under the Fourth Amendment of the United States Constitution. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Norton v. State,* Okl.Cr., 501 P.2d 877 (1972); *Hughes v. State,* Okl.Cr., 552 P.2d 1154 (1976). To this general rule there are certain "specifically established and well delineated exceptions." *Coolidge,* supra. Each of these exceptions is grounded in necessity: the nature of the specific situation must be such that it is not feasible for the law enforcement officials to take the time required to secure a search warrant, as to do so might result in the escape of a suspect, or in the loss or destruction of evidence. As we said in *Hughes,* supra, the existence of an emergency, otherwise known as "exigent circumstances," permits the law enforcement officer to substitute his judgment for that of a neutral and detached magistrate to the existence of probable cause to make a search.

■ In addition, it is without question that the existence of probable cause alone will not satisfy a warrantless search. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Whitehead v. State,* Okl.Cr., 546 P.2d 273 (1976). Ordinarily if an officer has probable cause to make a search, then he should go to a magistrate for a warrant authorizing such a search. Only when there are "exigent circumstances" in addition to the existence of probable cause may an officer legitimately make a search without a warrant.

■ And when the State seeks to rely on evidence discovered through a warrantless search, then the State must carry the burden of showing that the circumstances of the situation fell within one of the specific exceptions to the warrant requirement. *Coolidge,* supra; *Case v. State,* Okl.Cr., 519 P.2d 523 (1974).

The development of the exigent circumstances doctrine had its roots in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924). In that case the United States Supreme Court affirmed the warrantless search of an automobile on the ground that if government officers had taken the time to get a warrant, the automobile and its contents would have been gone. The Court drew a distinction between a search of a home or store, "or other structure in respect of which a proper official warrant may be readily obtained," and search of an automobile or boat, "where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll,* supra, at page 152, 45 S.Ct. at 285, 69 L.Ed. 551. The Court has consistently held to this distinction. Cf. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948); *Preston v. United States,* 376 U.S. 364, 11 L.Ed.2d 777, 84 S.Ct. 881 (1964); *Cooper v. State of Cal.,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

In *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947) the Su-

preme Court again distinguished between home and auto. This time, however, the warrantless search was of the defendant's room, and it was declared unlawful. But the Court left open the legitimacy of a warrantless search under "exceptional circumstances." And in *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), the Court—again while overturning a conviction based on a warrantless search of a defendant's room—cited *Johnson* in stating that a warrantless search would be justified when "the exigencies of the situation made that course imperative." *McDonald,* supra, at 456, 69 S.Ct. at 193, 93 L.Ed. 158.

The exigencies of the situation did make the course imperative in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). There police in hot pursuit of an armed robbery, searched a house from top to bottom, and found not only the suspect, but evidence later used against him. The Supreme Court affirmed the conviction, saying that a thorough search of the house was justified by the need to determine whether there might be more than one man in the house, and whether police had control of all weapons. In this case the Court for the first time used the phrase "exigent circumstances."

■ From this brief review we can conclude that stricter standards are to be applied when the search in question is of a fixed property rather than a moving vehicle. As *Carroll,* supra, and subsequent cases have shown, the fact of mobility in itself creates an exigent circumstance. Cf. *Coolidge,* supra, in which a search of a *parked* car was overturned. The Court there emphasized that the possibility of escape or loss of evidence arises when a car is stopped on the highway. In that situation delay can in fact be fatal. But *McDonald,* supra, stated that delay is not a sufficient reason to conduct a warrantless search of permanent premises, where there is no suspect attempting to flee and no danger of destruction or removal of contraband.

Turning to the case at issue, the record indicated that the defendants were still asleep when Sheriff Boaldin went to look at the premises. The marihuana that he saw was in the back yard of the defendant's residence. In the words of *McDonald,* supra:

> "[T]he defendant was not fleeing or seeking to escape. Officers were there to apprehend petitioners in case they tried to leave. Nor was the property in the process of destruction nor . . . likely to be destroyed . . . No reason, except inconvenience of the officers and delay in preparing papers and getting before a magistrate, appears for the failure to get a warrant." 335 U.S. at 455, 69 S.Ct. at 193, 93 L.Ed. 158.

Sheriff Boaldin passed up two opportunities to obtain a search warrant. He could have obtained one before he went to the defendants' residence; and failing that, he could have returned to town to obtain a search warrant after verifying the presence of contraband. When he went to the defendants' residence he was accompanied by three deputies. They could have stayed to watch the premises while he returned to town if the defendants had attempted to destroy the marihuana, or to flee, in that case there would have been exigent circumstances justifying an immediate entry onto the property.

The State argues that the initial sighting of the marihuana was a plain view discovery, rather than a warrantless search. According to this argument, Sheriff Boaldin was where he had a legal right to be when he saw the marihuana, since Mrs. Gresham had asked him to come out and look around. Thus he was justified in seizing the marihuana as contraband in plain view. But this argument is in error for two reasons.

The plain view doctrine has been developed in a line of cases beginning with *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927). The most recent case is *Coolidge v. New Hampshire,* supra. In that case the Court discussed the doctrine at length, and recognized two limitations.

■ The first limitation is that the fact that an object is in plain view is never by

itself a justification for a warrantless seizure. This is a parallel to the ruling that probable cause alone will not support a warrantless seizure. There must still be some sort of exigent circumstances to justify the failure to get a warrant:

"But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. [Citation Omitted]." *Coolidge v. New Hampshire, supra,* 403 U.S. at 468, 91 S.Ct. at 2039, 29 L.Ed.2d at 584.

■ The second limitation set out by the Supreme Court is that the discovery of evidence in plain view must be inadvertent. The point of this requirement is that if law enforcement officials know in advance what they are going to find, then they should get a search warrant. As the Supreme Court said in *Coolidge* :

"The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.' " 403 U.S. at 470–471, 91 S.Ct. at 2040, 29 L.Ed.2d 585 at 586.

Since the Supreme Court's ruling in *Coolidge,* this Court has strictly adhered to this requirement of inadvertence. Cf. *Morris v. State,* Okl.Cr., 507 P.2d 1327, (1973); *Johniken v. State,* Okl.Cr., 550 P.2d 979 (1976); *Faulkner v. State,* Okl.Cr., 554 P.2d 29 (1976); *Abbott v. State,* Okl.Cr., 565 P.2d 691 (1977).

■ In the instant case, not only were there no exigent circumstances, but Sheriff Boaldin's discovery of the marihuana can in no way be said to have been inadvertent. During his testimony, the Sheriff repeatedly stated that he went to the defendants' residence expecting to find marihuana. The Sheriff was asked, after he found some of the substance:

"Q. What did you then do?

"A. Pressed the—had the walkie-talkie in my hand, and I told the other officers to come on in, I had found what I was looking for. There was a hole about this big around that gapped open in the tarp. I could see marijuana through it.

"Q. When you say you found what you were looking for, Joe, I know what you mean, but the jury doesn't.

"A. Well, I was looking for marijuana.

"Q. Just speak it out and tell then what you found.

"A. I went out there looking for marijuana. At that point, I was satisfied there was no question but there was marijuana, and I called the other officers in to assist me."

As we have previously stated, Sheriff Boaldin had probable cause for issuance of a search warrant before he even went to the defendants' residence. Failing that, once he was satisfied that there was marihuana on the defendants' property, he should have posted a guard and returned to town for a warrant.

The arrest of the defendants and the subsequent search and seizure was allegedly premised upon Sheriff Boaldin's discovery of marihuana. The State contends that once the marihuana was observed that probable cause existed to make the arrests. This is a false premise under the facts of this case. As pointed out hereinbefore, the Sheriff was possessed with sufficient information to obtain the issuance of a search warrant but he lacked sufficient probable cause to enter the defendants' house or cross its curtilage, considering the facts developed at trial. Consequently, all evidence obtained from the defendants' house or on the premises thereof was inadmissible at trial; and it was error for the trial court to have admitted the same.

Therefore, it is the opinion of this Court that the convictions obtained in Jackson County District Court Case No. CRF–75–146, must be REVERSED and REMANDED for further proceedings not inconsistent with the foregoing.

REVERSED AND REMANDED.

BUSSEY, P. J., dissents.

CORNISH, J., concurs.